Sue DE LA CRUZ et al.,
Plaintiffs-Appellants,

v.

James TORMEY et al.,
Defendants-Appellees.

Nos. 76–2791, 76–3355.

United States Court of Appeals,
Ninth Circuit.

Sept. 13, 1978.

Carol R. Golubock, Ann Broadwell, Thomas R. Adams, Legal Aid Society of San Mateo County, Daly City, Cal., and Stephanie M. Wildman, Berkeley, Cal., for plaintiffs-appellants.

Thomas F. Casey, III, Deputy Dist. Atty., Redwood City, Cal., for defendants-appellees.

Before KILKENNY and WALLACE, Circuit Judges, and PALMIERI,* District Judge.

PALMIERI, District Judge:

In this appeal we are called upon to determine whether a statutory and constitutional challenge to facially neutral but allegedly discriminatory official action may be resolved on the pleadings. The issues presented for review are narrow but significant, involving troublesome questions of legal interpretation and of the proper role of the federal judiciary in overseeing the decisions of local administrative bodies in the field of public education.

The plaintiffs are young women with low incomes burdened with the problems of child rearing, whose essential complaint is that the lack of campus child care facilities in the San Mateo Community College District (the District) has deprived them of an equal educational opportunity. They have brought this action on their own behalf and on behalf of others similarly situated under the Civil Rights Act of 1871, 42 U.S.C. § 1983. Jurisdiction exists under 28 U.S.C. § 1343(3) and (4).

The thrust of plaintiffs' action is that defendants—the Board of Trustees and Chancellor of the District and the Presidents of the District's three colleges—have followed a policy of opposing all efforts of students and community groups to establish child care facilities in the District, thereby denying and burdening plaintiffs' equal access to the District's educational opportunities. Plaintiffs allege that the impact of this policy falls overwhelmingly on women, and that the resultant absence of child care facilities effectively bars them from obtaining the benefits of higher education. In particular, it is asserted that defendants arbitrarily maintain a "policy and practice" of refusing to allow child care facilities on campuses, refusing to apply for or accept funds for the establishment or maintenance of child care centers, and refusing to allow District funds to be used for these purposes.

The complaint pleads four claims for relief. In their first claim plaintiffs state that the defendants have violated their federal right to be free from sex discrimination in educational programs receiving federal monies under Title IX of the Education Act Amendments of 1972, 20 U.S.C. § 1681, which provides, in part, as follows:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance.

Plaintiffs' second claim states that defendants' actions are violative of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution because they constitute intentional, invidious, gender-based discrimination and because they are arbitrary and unrelated to the legitimate goal of providing education.

In their prayer for relief, plaintiffs request, *inter alia*, a declaratory judgment to the effect that defendants have acted illegally and unconstitutionally, and temporary and permanent injunctions restraining defendants from maintaining their allegedly discriminatory "anti-child-care" policy and requiring them to take affirmative steps

* The Honorable Edmund L. Palmieri, Senior United States District Judge for the Southern District of New York, sitting by designation.

with a view to the development of child care in the District, including the allowance of private centers on campuses, the acceptance of federal, state, and county funds for this purpose, and the use of its own funds to this end.

In response to a motion by defendants pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, the District Court dismissed the entire complaint on the ground that it failed to state any claim upon which relief could be granted. Plaintiffs appeal only from so much of the District Court's order as dismissed their first two claims for relief. Their third and fourth claims, involving matters of California law, stand finally dismissed and are not before us.

## I.

■ The standard to be applied in ruling on a motion to dismiss claims for legal insufficiency—a motion viewed with disfavor in the federal courts, *Rennie & Laughlin, Inc. v. Chrysler Corporation*, 242 F.2d 208, 213 (9th Cir. 1957)—is well established. In the words of the test most often applied:

In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) (footnote omitted).

■ The issue is not whether a plaintiff's success on the merits is likely but rather whether the claimant is entitled to proceed beyond the threshold in attempting to establish his claims. Moreover, in passing on a motion to dismiss, the allegations of the complaint should be construed favorably to the pleader. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). See 5 Wright & Miller, Federal Practice and Procedure: Civil § 1355.

Our task, then, is clearly defined. We must determine whether or not it appears to a certainty under existing law that no relief can be granted under any set of facts that might be proved in support of plaintiffs' claims.

## II.

*The Nature of the Alleged Discrimination*

The satisfactory characterization of the allegedly unlawful governmental action sought to be remedied by the present suit poses a legal problem of some novelty and no little magnitude, one whose solution requires a closer scrutiny of the precise claims made. We begin, then, with a more thorough review of the specific conduct challenged by the plaintiffs.

After chronicling the apparently severe shortage of child care facilities for low-income families in San Mateo County, the complaint states, and we quote at some length:

In order to document the great need for child care for presentation to the Board of Trustees, in the Fall of 1973, the Associated Students of the College of San Mateo, (ASCSM) conducted a survey of over 3500 students as to their needs for child care. The ASCSM also began a co-operative effort with members of the District Planning Staff to conduct a feasibility study for child care on campus. Pursuant to these efforts, defendants were persuaded to hire a child care consultant, Sue Brock, to do a study for a District-wide approach to solving the child care problem.

In August, 1974, the ASCSM presented to defendants, Board of Trustees, the results of their survey showing an overwhelming need for child care, and the report of the child care consultant which further documented the overwhelming need and recommended a five-step program to deal with the child care problem including application for state and federal funding. With support from representatives of various community groups . . . ASCSM recommended that space be designated immediately on campus for the use of students who had organized to care co-operatively for their youngsters while a comprehensive program of child care was being developed.

The defendant Board of Trustees refused to take any action.

In September, 1973, the District Advisory Committee for Early Childhood Education, a committee composed of faculty and students of the Early Childhood Education Department and of representatives of the community and community public service agencies, issued a report recommending the development of a child care facility to provide care for children of students and to provide additional laboratory [sic] for Early Childhood Education students. Defendants refused to act on this recommendation and have repeatedly refused to do so each year since 1973.

\*       \*       \*       \*       \*       \*

In February, 1975, a faculty member at Canada College, with support from women students, applied for a grant from San Mateo County under Title I of the Comprehensive Employment and Training Act ([29] U.S.C. §§ 801 et seq.) to pay staff to manage a child care center. The application had been encouraged by the staff of a local Manpower agency as the County Manpower Planning Council had allocated $78,000.00 for child care in the area where Canada College was located. The application received preliminary approval from the Manpower staff for the full $78,000.00. However, approval by defendants was necessary before final approval. Defendants refused to accept these monies.

\*       \*       \*       \*       \*       \*

In the Summer of 1975, a group of mothers who were students at Canada College and had organized a child [care] co-operative were given permission to use space in a church on a temporary basis, rent free. The group appealed to defendants for any support the District could possibly give. They were denied support of any form.

In September, 1975, defendants refused a group of women students at the College of San Mateo who had formed a child care co-op permission to use a vacant room or any other space at the College. In October, 1975, a group of women students at Skyline College approached the local elementary school district and were offered space for a child care center if the District would co-operate in the establishment of such a center. The District did not respond to the offer.

In December, 1975, the two groups of women students who had formed child care co-operatives applied to the State Board of Education for funds appropriated under the Campus Child Development Act (Stats.1975, Ch. 1012, p. 2654 [2391]) to fund child care centers in off-campus locations. These applications were approved by the State subject to acceptance by the District. On January 14, 1976, the Board voted to refuse the funds, again thwarting attempts to establish child care centers. The District would not have been required to spend any of its own funds, nor to donate any of its own facilities as private sources could have provided the required matching funds and locations for the centers.

Initially, it is difficult to conceive how this course of events, which would seem to reflect little more than a series of political defeats in an area traditionally reserved to the sound policy-making discretion of administrative and legislative bodies, can form the predicate for a legal challenge. However, upon closer inspection it appears that the plaintiffs have amply stated a claim of discrimination entitling them to an opportunity to make good on their allegations. A review of the governing authorities makes clear that this is so.

There are two fundamentally different ways in which governmental action can run afoul of the Equal Protection Clause of the Fourteenth Amendment or statutes prohibiting invidious discrimination. The first occurs when the Government explicitly classifies or distinguishes among persons by reference to criteria—such as race, sex, religion, or ancestry—which have been determined improper bases for differentiation.

Such governmental action is often termed "facially" discriminatory.[1] Not all such discriminations, of course, are unlawful, but only those which cannot sufficiently be accounted necessary to the accomplishment of legitimate objectives.

■ A second and more subtle variety of discrimination focuses, not on the form of the governmental action, as does the first, but rather upon its results. As with facial discriminations, decisions or actions which, while in form nondiscriminatory, produce effects which weigh adversely and disproportionately upon the members of a particular protected group of individuals, may require explanation in terms of non-invidious purposes.

Here there can be no claim of discrimination of the first sort. The decisions and actions of the District which plaintiffs seek to subject to judicial scrutiny are not restricted in their application to the members of one sex or the other; on-campus child care facilities are equally unavailable to both men and women, and to those both with and without child-rearing responsibilities. No classification by sex or employment of gender-related criteria appears.[2] This fact has the consequence of rendering largely inapplicable the growing body of cases dealing with explicit gender-based discrimination,[3] and compelling us to navi-

1. For a very recent case of discrimination of this first sort, see *Regents of the University of California v. Bakke*, —— U.S. ——, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978).

   *Los Angeles v. Manhart*, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978), is relied upon by our dissenting brother for its reference to a "simple test" for sex-based discrimination—"whether the evidence shows 'treatment of a person in a manner which but for the person's sex would be different,' " *id.* at 1377 (footnote omitted). We believe that this reference is at most descriptive of a theory of facial discrimination, in which inequality of treatment is at issue, and not of a theory of discriminatory effect, in which attention is drawn to the disparate impact of facially equal treatment. *Manhart* involved a contribution differential under a pension plan that discriminated on its face and which therefore failed even this "simple" test. The fact that the action here challenged survives this test signals nothing more than the necessity for further analysis.

2. This apparently was the basis upon which the District Court here dismissed plaintiffs' equal protection claim. It stated:

   Plaintiffs' second cause of action, that defendants' conduct is violative of plaintiffs' equal protection guarantees, is also without merit. The facts of this case are controlled by the holding in *Geduldig v. Aiello*, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1975) [*sic*; should read "(1974)"]. Defendants' refusal to promote child care services does not create a sex-based classification. Defendants may therefore choose not to provide child care services on any rational basis.

3. The recent history of constitutional doctrine with respect to explicit gender-based discrimination begins with *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). In subsequent cases Supreme Court opinions indicate more elaborately that classification by gender is impermissible unless important governmental objectives are substantially furthered thereby. *Califano v. Goldfarb*, 430 U.S. 199, 209 n.8, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977); *Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976).

   *Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973), introduces the general problem:

   There can be no doubt that our Nation has had a long and unfortunate history of sex discrimination. Traditionally, such discrimination was rationalized by an attitude of "romantic paternalism" which, in practical effect, put women, not on a pedestal, but in a cage.

   . . . . .

   It is true, of course, that the position of women in America has improved markedly in recent decades. Nevertheless, it can hardly be doubted that, in part because of the high visibility of the sex characteristic, women still face pervasive, although at times more subtle, discrimination in our educational institutions, in the job market and, perhaps most conspicuously, in the political arena.

   *Id.* at 684, 685–86, 93 S.Ct. at 1769, 1770 (footnotes omitted).

   In *Schlesinger v. Ballard*, 419 U.S. 498, 507, 95 S.Ct. 572, 577, 42 L.Ed.2d 610 (1975), the Court noted its concern with classifications based on sex which were "premised on overbroad generalizations that could not be tolerated under the Constitution."

   In *Weinberger v. Wiesenfeld*, 420 U.S. 636, 645, 95 S.Ct. 1225, 1231, 43 L.Ed.2d 514 (1975), the Court characterized "the notion that men are more likely than women to be the primary supporters of their spouses and children," while "not entirely without empirical support," as a "gender-based generalization" which could not justify the statutory provision there in question.

gate somewhat at the margin of existing equal protection doctrine.

■ The decisions of the United States Supreme Court in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), and *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), establish that litigants proceeding on the second theory of discrimination outlined above are required to prove two essential elements before they can be entitled to relief under the Fourteenth Amendment: discriminatory effect and invidious discriminatory intent or purpose.[4] While proof of the latter element may not be necessary in the context of certain statutes prohibiting discrimination, see note 16 *infra*, a sufficient demonstration of the former, discriminatory effect, is equally required there. Leaving the nature and necessity of proof of intent or purpose to the following sections, we devote the remainder of our present discussion to an explication of the concept of discriminatory effect and our conclusion that one has been pleaded by the plaintiffs here. To do so will require a review of a number of recent decisions in which that concept has been employed and from which, accordingly, we will need to draw in the further course of our discussion.

In *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), a unanimous Court construed Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, to proscribe "not only overt discrimination but also practices that are fair in form, but discriminatory in operation." *Id.* at 431, 91 S.Ct. at 853. In language which has since become famous, Congress was held to have required "the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers *operate* invidiously to discriminate on the basis of racial or other impermissible classification." *Id.* (emphasis added). The result serving to establish a claim of discrimination in that case was the disqualification of a markedly disproportionate number of blacks from employment or job transfer flowing from the respondent's requirements of a high school diploma and passage of standardized intelligence tests. Because these requirements were not shown to have been related to successful job performance or otherwise to have fulfilled a legitimate business need, *id.* at 431–32, 91 S.Ct. at 854, their use was held to be violative of the Act.

*Lau v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974), involved a claim of

Finally, *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), which condemned a state law discriminating between men and women with respect to the age at which they could purchase "non-intoxicating" 3.2% beer, summed up this history as follows:

*Reed v. Reed* has also provided the underpinning for decisions that have invalidated statutes employing gender as an inaccurate proxy for other, more germane bases of classification. Hence, "archaic and overbroad" generalizations, *Schlesinger v. Ballard, supra,* [419 U.S.] at 508, 95 S.Ct. [572], 577, concerning the financial position of servicewomen, *Frontiero v. Richardson, supra,* [411 U.S.] at 689 n.23, 93 S.Ct. [1764], 1772 and working women, *Weinberger v. Wiesenfeld,* 420 U.S. 636, 643, 95 S.Ct. 1225, 1230, 43 L.Ed.2d 514 (1975), could not justify use of a gender line in determining eligibility for certain governmental entitlements. Similarly, increasingly outdated misconceptions concerning the role of females in the home rather than in the "marketplace and world of ideas" were rejected as loose-fitting characterizations incapable of supporting state statutory

schemes that were premised upon their accuracy. *Stanton v. Stanton,* [421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975)]; *Taylor v. Louisiana,* 419 U.S. 522, 535 n.17, 95 S.Ct. 692, 700, 42 L.Ed.2d 690 (1975). In light of the weak congruence between gender and the characteristic or trait that gender purported to represent, it was necessary that the legislatures choose either to realign their substantive laws in a gender-neutral fashion, or to adopt procedures for identifying those instances where the sex-centered generalization actually comported to fact. See, *e. g., Stanley v. Illinois, supra,* [405 U.S.] at 658, 92 S.Ct. [1208], 1216, 31 L.Ed.2d 551; cf. *Cleveland Bd. of Ed. v. LaFleur,* 414 U.S. 632, 650, 94 S.Ct. [791], 801, 39 L.Ed.2d 52 (1974). *Id.* at 198–99, 97 S.Ct. at 457–58.

See also *Califano v. Webster,* 430 U.S. 313, 97 S.Ct. 1192, 51 L.Ed.2d 360 (1977); *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977).

4. See *Bakke, supra* note 1, 98 S.Ct. at 2748 n.27.

discrimination under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. Non-English-speaking students of Chinese ancestry argued that the failure of San Francisco's public schools to provide them with supplemental courses in the English language or some other means of overcoming their linguistic deficiency denied them an equal educational opportunity. A majority of the Justices of the Supreme Court agreed, holding that discrimination which had the effect of depriving the petitioners of an equal educational opportunity was barred, "even though no purposeful design is present." *Id.* at 568, 94 S.Ct. at 789.

*Washington v. Davis, supra,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597, and *Arlington Heights v. Metropolitan Housing Development Corp., supra,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450, both represent instances in which a "discriminatory effect" challenge under the Fourteenth Amendment was unsuccessful because of the failure of the challengers to establish the existence of a discriminatory purpose. They are of interest in the present context, however, because of the additional light they shed on the nature of the other element necessary to be proved in a legal attack upon facially neutral official action—discriminatory effect itself.

The effect challenged in *Davis* was the highly disproportionate exclusion of black applicants from employment with the District of Columbia police department caused by that department's use of a qualifying test. In *Arlington Heights* it was the denial of housing and allegedly resulting employment opportunities to a large group of poor and minority persons through a municipality's refusal to re-zone certain land sought to be used for low- and moderate-income housing. While holding that a racially disproportionate impact is not the "sole touchstone" of an invidious discrimination and alone is insufficient to establish a violation of the Constitution, 426 U.S. at 242, 96 S.Ct. 2040; 429 U.S. at 264–65, 97 S.Ct. 555, the Court in both cases clearly intimated that such an impact, when coupled with proof of invidious intent, would establish such a violation. It is instructive to note

that the Court in *Davis* used the terms "discriminatory impact" and "disproportionate impact" interchangeably, 426 U.S. at 242, 96 S.Ct. 2040, and that throughout both opinions the preferred term for the "effect" element seems to be the latter.

In *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), this "discriminatory effect" analysis was employed in the context of a claim of gender-based discrimination. There, the Court affirmed a finding of the district court that a prima facie case of unlawful sex discrimination was established by a showing that certain facially neutral height and weight employment standards had a disproportionate impact upon women applicants. Citing *Griggs, supra,* and *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), the Court observed:

> Those cases make clear that to establish a prima facie case of discrimination, a plaintiff need only show that the facially neutral standards in question select applicants for hire in a significantly discriminatory pattern.

433 U.S. at 329, 97 S.Ct. at 2726.

■ These cases, and many more which could be cited, demonstrate that the term "discriminatory effect" and its paraphrases simply serve to capture the sort of differential, disparate, or disproportionate consequences which facially nondiscriminatory laws, decisions, or other actions may have upon the members of a particular protected minority. As such, they operate only to signal the *beginning* of analysis—an analysis which must ultimately answer the question whether the effected discrimination is invidious and thus unlawful. Nowhere has the Court intimated that these terms are to be assigned any special or technical meaning, or that they play any substantially independent role in the analysis. While the procedural and substantive significance of an allegation or finding of discriminatory effect will, of course, depend upon the legal and factual environment in which it is made, the concept itself is relatively elementary, straightforward, and capable of application in a wide variety of factual contexts.

■ The application of these principles to the present suit does not pose any insuperable problem. Remaining, as we must, on the level of allegation, it is clear that at least some child care centers in addition to those already in existence would have been established had the defendants not acted—or refused to act—as they did. The alleged effect of this consequence upon the plaintiffs and the class they claim to represent is stated in the following excerpts from the complaint:

The plaintiffs in this action include mothers who would attend a community college in San Mateo County but who cannot attend a community college solely because of the lack of child care facilities. Other plaintiffs in this action are able to attend community college but only through the use of makeshift and temporary child care arrangements. All of the plaintiffs in this case are being denied an opportunity for education or are threatened with a denial of educational opportunity solely on account of the lack of child care facilities in the San Mateo Community College District. Since the plaintiffs cannot find employment without more education, the denial of child care facilities forces the plaintiffs into low paying jobs or onto welfare.

\*　　\*　　\*　　\*　　\*　　\*

Plaintiffs and the class they represent are thus being deprived of their right of access to educational opportunities on the basis of sex in that the lack of child care facilities is a burden which falls almost exclusively on women and prevents women from participating in and denies them the benefits of educational programs in the District.

\*　　\*　　\*　　\*　　\*　　\*

As a result of defendants' policy and practices, educational opportunities are not made available or are made available on an unequal basis to substantial numbers of women. . . . [T]he direct effect of their actions is to exclude or burden substantial numbers of women.

There can be little doubt that a discriminatory effect, as that term is properly understood and has been used by the Supreme Court, has been adequately alleged. The concrete human consequences flowing from the lack of sufficient child care facilities, very practical impediments to beneficial participation in the District's educational programs, are asserted to fall overwhelmingly upon women students and would-be students. The abstract character of this effect is legally indistinguishable from that characterized as disproportionate impact or discriminatory effect in *Lau*[5] and *Arlington Heights*. Additionally, it cannot be said from the pleadings that plaintiffs will be unable to establish the degree of statistical imbalance which sufficed to trigger further inquiry in such cases as *Griggs*, *Davis*, and *Dothard*. If an unsurmounted obstacle to the successful statement of a claim of discrimination is to be identified, it must be found elsewhere.

■ It remains to consider a number of other preliminary objections which may be advanced to the actionability of the alleged facts. Initially, it may be questioned how the defendants' inaction or refusal to act can form the basis for a claim of discrimination. It may even be said that no "act" of discrimination has been alleged at all. The answer to this objection is that the form of the challenged conduct is of little relevance to suits proceeding upon a theory of discriminatory effect. By their decisions in the child care area defendants have surely "acted." The fact that this action assumed a negative character can no more be a bar to the present suit than it was in *Arlington Heights* or *Lau*.

In a more persuasive refinement of this objection, however, our dissenting brother

---

5. The dissent notes a number of distinctions between *Lau* and the present case, which we do not minimize. The facts in that case presented a more compelling justification for judicial intervention than those here alleged. But as the proffered distinctions go to the background, circumstances, and hence legitimacy of the challenged policy, rather than to the characterization of its effects as discriminatory *vel non*, the importance of those distinctions can only be appraised at a later stage of this litigation. They do not constitute authority for its premature termination.

argues, on the strength of *Geduldig v. Aiello*, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974), *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 30 L.Ed.2d 34 (1976), and *Nashville Gas Co. v. Satty*, 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977), that no discriminatory effect may be shown where one simply "declines to extend an additional benefit of disproportionate value to certain members" of a particular group of people, so long as existing benefits are made available in a neutral fashion. *Post*

at p. 69. From *Palmer v. Thompson*, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971), he would draw a correlative principle, *viz.*, that the effect or impact upon the would-be beneficiaries of a particular social or economic program which a government body decides not to initiate or support is excluded from the definition of discriminatory effect. *Post* at p. 70–71. For the reasons set forth in the margin, we conclude that *Geduldig, Gilbert,* and *Satty*,[6] on the one hand, and *Palmer*,[7]

**6.** It must be borne in mind that the litigants in *Geduldig* and *Gilbert* did not proceed upon a theory of discriminatory effect. The Court in *Gilbert* stated:

As in *Geduldig*, respondents have not attempted to meet the burden of demonstrating a gender-based discriminatory effect resulting from the exclusion of pregnancy-related disabilities from coverage.

429 U.S. at 137, 97 S.Ct. at 409 (footnote omitted). Probable explanations for this choice of strategy are that women apparently received more in aggregate benefits under the challenged plans than did men, *see Geduldig*, 417 U.S. at 497 n. 21, 94 S.Ct. 2485, and that prior to *Gilbert* it had been the uniform interpretation of all of the Courts of Appeals that had considered the question that the treatment of pregnancies differently from other disabilities was *per se* discriminatory in the Title VII context, thus making it unnecessary to establish a disproportionate impact. See cases cited in *Gilbert*, 429 U.S. at 147, 97 S.Ct. at 401 (Brennan, J., dissenting). The thrust of the litigants' claims in these cases was, rather, that disabilities resulting from pregnancy were so gender-specific as to make distinctions involving them discriminatory *on their face*. It was this argument which the Court rejected, and it is in this context that its decisions must be read.

In *Gilbert* the Court characterized its previous decision in *Geduldig* as having rested upon the fact that "the exclusion of pregnancy from coverage under California's disability benefits plan was not *in itself* discrimination based on sex." 429 U.S. at 135, 97 S.Ct. at 407 (emphasis added). Several paragraphs later the Court found *Geduldig* "precisely in point in its holding that an exclusion of pregnancy from a disability benefits plan providing general coverage is not a gender-based discrimination *at all.*" *Id.* at 136, 97 S.Ct. at 408 (emphasis added). While this second statement arguably interjected an ambiguity not necessarily present in the first, the context in which these statements are found amply demonstrates that they were meant simply to embody the Court's conclusion that the challenged plans were not *facially* discriminatory. This is evidenced by the Court's recognition "that the fact that there [is] no

sex-based discrimination *as such* [is] not the end of the analysis," *id.* at 135, 97 S.Ct. at 407 (emphasis added), and by the necessity it perceived of inquiring further whether a showing of discriminatory effect had been made—an inquiry which would have been unnecessary if the Court had been of the view that the challenged plan was categorically immune from a finding of discriminatory effect. As the Court said, again construing *Geduldig*,

Since gender-based discrimination had not been shown to exist *either* by the terms of the plan *or* by its effect, there was no need to reach the question of what sort of standard would govern our review had there been such a showing.

*Id.* (emphasis added). *See also id.* at 137 n. 15, 97 S.Ct. 409. ["Absent a showing of gender-based discrimination, as *that* term is defined in *Geduldig, or* a showing of gender-based effect, there can be no violation of § 703(a)(1)." (Emphasis added.)]

A consideration of the manner in which the Court in *Gilbert* addressed and resolved the question of whether an adequate discriminatory effect had been shown confirms that the concepts of facial discrimination and discriminatory effect were maintained analytically distinct, and that the Court's categorical statements quoted above can only be read as involving the former. The Court first refused to *infer*, there being "no more showing in this case than there was in *Geduldig* that the exclusion of pregnancy benefits is a mere 'pretext designed to effect an invidious discrimination against the members of one sex or the other,'" that "the exclusion of pregnancy disability benefits from petitioner's plan is a simple pretext for discriminating against women." 429 U.S. at 136, 97 S.Ct. at 408. It then proceeded to review the evidence to determine—if this indeed is an entirely separate inquiry—whether a sufficient showing of discriminatory effect could be made out, a determination considerably eased by respondents' conceded failure to assume the burden of proving it. Concluding that "there is no *proof* that the package is in fact worth more to men than to women," *id.* at 138, 97 S.Ct. at 409 (emphasis added), the

**7.** Note 7 on p. 55.

Court went on to say that, in the absence of such proof, "it is impossible to find any gender-based discriminatory effect *simply* because women disabled as a result of pregnancy do not receive benefits," or "*simply* because an employer's disability benefits plan is less than all-inclusive." *Id.* at 138–39, 97 S.Ct. at 409 (emphasis added). Absent proof to the contrary, then, an employer's failure to compensate women for the additional risk of pregnancy-related disabilities · "does not destroy the presumed parity of the benefits . . . which results from the facially evenhanded *inclusion* of risks." *Id.* at 139, 97 S.Ct. at 410 (emphasis in original). The clear import of this language is that a finding of discriminatory effect *could* be sustained where sufficient proof establishes that "the package is in fact worth more to men than to women," notwithstanding its facial neutrality and notwithstanding the circumstance that the challenged action took the form of a "mere" refusal to confer additional benefits. The result in *Gilbert* did not depend upon a revision or restriction of the concept of discriminatory effect, but upon the litigants' failure to prove effects falling within its ordinary meaning.

Attention should be drawn to the concurrences of Justices Stewart and Blackmun in the Court's opinion, at least one of which was necessary to secure a majority. Significantly, both Justices rested their concurrences upon the absence of a *per se* violation of Title VII and the failure of respondents to discharge their burden of proving discriminatory effect. Justice Stewart did not "understand the opinion to question . . . the significance generally of proving a discriminatory effect in a Title VII case," 429 U.S. at 146, 97 S.Ct. at 413. Justice Blackmun refused to join in any "inference or suggestion . . . that effect may never be a controlling factor in a Title VII case, or that *Griggs v. Duke Power Co.* . . . is no longer good law." *Id.* If there is to be found in *Gilbert* a departure from the ordinary meaning of discriminatory effect, whether expressly or inferentially, it is clearly a departure not carrying with it the imprimatur of a majority of the Court.

*Nashville Gas Co. v. Satty*, 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977), is not inconsistent with the foregoing analysis of *Geduldig* and *Gilbert*. There, the Court, in resolving a claim of discrimination respecting an employer's policy described as "legally indistinguishable from the disability insurance program upheld in *Gilbert*," *id.* at 352, 98 S.Ct. at 352, noted again the respondent's failure to *prove* discriminatory effect. If a "facially neutral plan, whose only fault is underinclusiveness," *id.*, were categorically immune from such proof, this determination would have been surplusage. The Court's reluctance to resolve claims of the sort advanced in *Gilbert* and *Satty* without reference to an evidentiary record is

further illustrated by its remand of the case in *Satty* for a determination whether respondent had adequately preserved the right to proceed further in the district court on the "mere pretext" theory. *Id.* at 353, 98 S.Ct. at 352. Such further proceedings would, of course, be meaningless if that issue could be resolved on the pleadings.

7. The central question presented to and decided by the Supreme Court in *Palmer* was whether illicit motivation alone could render otherwise valid official action constitutionally invalid. The Court of Appeals for the Fifth Circuit had rejected the contention that "since the pools had been closed either in whole or in part to avoid desegregation the city council's action was a denial of equal protection of the laws." 403 U.S. at 219, 91 S.Ct. at 1942. The Supreme Court "granted certiorari to decide *that* question." *Id.* (emphasis added). That question forms the focus of Justice Black's opinion, as well as that of the concurring opinions of Justices Burger and Blackmun. Moreover, the Court's answer to this question is the basis upon which *Palmer* is recognized and cited.

Preliminarily, it may be useful to review the manner in which the Court resolved the central question posed. Certain language in the opinion suggests that the Court based its conclusion on the ground that the lower courts' findings of legitimate motivation had sufficient support in the record. *See* 403 U.S. at 225, 91 S.Ct. 1940. But it is clear that, even were these findings not accepted, the Court would have regarded a showing that the pools were closed out of ideological opposition to desegregation as an insufficient basis upon which to invalidate the city's decision. *Id.* at 224, 91 S.Ct. at 1944. ["[N]o case in this Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it."] This, of course, is the holding most often associated with *Palmer*. Finally, however, the Court stated in categorical terms that "*[n]othing* in the history or the language of the Fourteenth Amendment nor in any of our prior cases persuades us that the closing of the Jackson swimming pools to all its citizens constitutes a denial of 'the equal protection of the laws.'" *Id.* at 226, 91 S.Ct. at 1945 (emphasis added). Whether this or other language can be read to broaden the Court's holding is the immediate question.

At no point in its opinion did the Supreme Court expressly confront or resolve the question whether the refusal to extend benefits can be said to have a discriminatory effect. Indeed, its language at several points indicates that the Court's attention was not directed to this issue. Thus:

Furthermore, there is an element of futility in a judicial attempt to invalidate a law because of the bad motives of its supporters. If the law is struck down for this reason, *rather than* because of its facial content or *effect*, it would presumably be valid as soon as the

on the other, when fairly read, do not countenance such firm conclusions and that the reliance of the dissent upon these decisions is misplaced. One reason is that each of these cases was decided on a relatively full evidentiary record and not, as here, upon a construction of the pleadings. An eagerness to find in these decisions the seeds of a solution to the present case should be dampened, however, by one more fundamental observation.

The benefits not granted or programs not offered in each of the above cases were not alleged to have been essential or even related to the enjoyment of benefits already conferred or programs already in existence. That no public swimming pools were maintained by the city in *Palmer* did not prevent blacks and other citizens from taking full advantage of other, integrated public facilities. Similarly, the decision of employers in *Geduldig, Gilbert* and *Satty* to exclude disabilities resulting from pregnancy from the risks covered by their insurance plans did not impair the value of the included coverages. Here, by contrast, the essence of plaintiffs' grievance is that the absence of child care facilities renders the *included* benefits less valuable and less available to women; in other words, that the effect of the District's child care policy is to render the entire "package" of its educational programs of lesser worth to women than to men. Thus, there is some doubt that the situation which they challenge may be fitted nicely into the rubric of "underinclusiveness." Were the object of their chal-

legislature or relevant governing body repassed it for different reasons.

403 U.S. at 225, 91 S.Ct. at 1945 (emphasis added). And:

It is true there is language in some of our cases interpreting the Fourteenth and Fifteenth Amendments which may suggest that the motive or purpose behind a law is relevant to its constitutionality. [Citations omitted.] But the focus in those cases was on the actual *effect* of the enactments, not upon the motivation which led the States to behave as they did.

*Id.* (emphasis added).

It is significant that where the Court did arguably turn to the question of discriminatory effect, it did so by reference to the evidence:

Here the *record* indicates only that Jackson once ran segregated public swimming pools and that no public pools are now maintained by the city. . . . It [*i. e.*, the record] shows no state action affecting blacks differently from whites.

*Id.* (emphasis added). This passage serves to underscore one especially important factor distinguishing *Palmer* from the present case: namely, that it was decided upon a reasonably full record, and not upon a construction of the pleadings. At several other points in the opinion the Court rejected arguments because of their lack of support in the evidence. *See, e. g.*, 403 U.S. at 222, 223–24, 91 S.Ct. 1940. In this connection it should be noted that Justice Blackmun's needed concurrence appears contingent upon the fact that he was "impressed" with an enumeration of "factors," all of which came from the evidence, not the pleadings. *Id.* at 229–30, 91 S.Ct. 1940.

While *Palmer* might be read as implicitly finding no discriminatory effect on its facts, see, e. g., 403 U.S. at 220 n. 5, 91 S.Ct. 1940—although even this is not certain, because such a finding was not necessary to its holding, discriminatory effect alone being insufficient to establish a violation of the equal protection clause—it simply throws no light on the question of what *does* constitute "state action affecting blacks differently from whites." In neither its holdings nor its dicta did the Court state what pleaded facts are legally sufficient to establish the requisite effect. This being so, *Palmer* does not elucidate, let alone control, our resolution of the present case.

In addition to what has been said, it is significant that *Palmer* was decided at a time (1971) when much of the structure of Supreme Court doctrine in the "facially neutral" area, even now incomplete, had yet to be authoritatively formulated. To read ambiguous passages in that case as resolving in advance questions of the definition of discriminatory effect is inconsistent with its treatment in more recent cases, which seem to confine its holding to the proposition that invidious motivation alone will not suffice to establish a constitutional violation. *See, e. g., Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), in which the Court states, referring to *Palmer*:

But the holding of the case was that the legitimate purposes of the ordinance—to preserve peace and avoid deficits—were not open to impeachment by evidence that the councilmen were actually motivated by racial considerations. Whatever dicta the opinion may contain, the decision did not involve, much less invalidate, a statute or ordinance having neutral purposes but disproportionate racial consequences.

*Id.* at 243, 96 S.Ct. at 2049. *Davis* has been read by at least one commentator as giving *Palmer* a "quiet burial." L. Tribe, *American Constitutional Law* 1031 n. 28 (1978).

lenge simply a refusal to initiate or support a program or course of particular interest and value to women—women's studies, for instance—the case might be a much easier one. Where, however, a refusal to confer additional benefits is alleged, on account of the peculiar nature of those benefits, to impair the value of *existing* programs to members of a particular group, the principles sought to be derived from *Gilbert et al.* do not support the conclusion that this allegation may be deemed meritless prior to any consideration of its evidentiary basis.

A second and related objection would attribute the complained-of effects to a "totally external and independent social condition," one which in no way can be the responsibility of defendants to remedy. This, of course, has a large element of truth, but it mistakes the nature of the claim being made. Plaintiffs do not charge the District with an affirmative obligation to remedy conditions not of their making. Rather, they demand that its decisions, particularly those weighing adversely upon large numbers of women, be made in furtherance of constitutionally permissible objectives and purposes. While both *Arlington Heights* and *Lau* involved situations not fairly attributable to the alleged discriminators, this circumstance did not serve to undermine the actionability of the complaints in those cases.[8]

Lastly, one may point to the fact that the effects of the challenged "policy" do not fall exclusively upon women, as did those in *Gilbert* or *Geduldig*, but affect as well men with child-rearing responsibilities. This, however, is in the very nature of the theory upon which plaintiffs have proceeded. Challenges which rely upon disparate impact inevitably will involve consequences which are not restricted in their operation to one group or another. The essence of this sort of legal attack is imbalance and disproportionality. The lack of pure gender-specificity is no bar here, as it was no bar to a finding of discriminatory effect in *Dothard, supra.*

A final test will confirm the soundness of the reasoning to this point. Let us assume, for the moment, that the plaintiffs are able to prove, pursuant to the principles reviewed in the following section, that the proximate motivation for the District's refusal to initiate or support the development of child care facilities has been an invidious, sex-discriminatory purpose; for example, to pick an extreme case, a desire to disadvantage women students so as to prevent their increase in the student population, arising, perhaps, from a conviction that higher education for women is superfluous and unimportant. Let us assume further that were it not for such a purpose, child care facilities would long ago have been developed in the District, either pursuant to outside funding or through cooperation with community organizations. Upon this assumption—extravagant, perhaps, but one which cannot be ruled out without this Court allowing itself to be cast *sub silentio* into the role of a finder of fact—would the plaintiffs' case fail simply because the effects of the District's decision, albeit falling disproportionately upon the persons intended to be disadvantaged, could not be brought within the confines of the concept of discriminatory effect? To state the question is almost to answer it, and to answer it in the negative. For if actions of this nature were subject to dismissal on this ground, the Government would be given a wide range of areas in which to pursue and accomplish

---

8. The Court's discussion of this point in *Lau* is instructive:

The Court of Appeals reasoned that "[e]very student brings to the starting line of his educational career different advantages and disadvantages caused in part by social, economic and cultural background, created and continued completely apart from any contribution by the school system," 483 F.2d [791], at 797. Yet in our view the case may not be so easily decided. [After noting the expressed California state policy of insuring "the mastery of English by all pupils in the schools" and the authorization of bilingual education, the Court continued:] Under these state-imposed standards there is no equality of treatment merely by providing students with the same facilities, textbooks, teachers, and curriculum; for students who do not understand English are effectively foreclosed from any meaningful education. 414 U.S. at 565–66, 94 S.Ct. at 788.

patently unconstitutional and illegal ends, unimpeded by any possibility of judicial review. Were this so, there would have been no reason for the Supreme Court in *Arlington Heights* to have articulated the necessity for proof of invidious intent; such proof would have been a futile gesture, the character and effects there of the challenged governmental action being equally outside of a narrowly drawn concept of discriminatory effect. On the contrary, any fair reading of *Arlington Heights* compels the conclusion that, had the requisite discriminatory intent been shown, the challenged decision would have been invalidated. This is likewise so, we believe, in this case.

## III.
### *Equal Protection*

As already noted, the decisions in *Washington v. Davis, supra,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597, and *Arlington Heights v. Metropolitan Housing Development Corp., supra,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450, make it clear that official action, neutral on its face, will not be held violative of the Equal Protection Clause simply because it results in a racially disproportionate impact. *A fortiori,* the allegation of a sexually disproportionate impact here, standing alone, is insufficient to state a violation of the Constitution. Had plaintiffs restricted themselves to an allegation of disparate impact, therefore, the dismissal of their equal protection claim would have been proper.

The complaint, however, cannot fairly be viewed as so limited. In addition to asserting the unequal effect of defendants' actions, plaintiffs have alleged a course of conduct by defendants susceptible of an inference of intentional discrimination:

Knowing that their actions resulted in women being denied access to education, defendants *intentionally continued a policy* and practice of thwarting all attempts to provide child care to plaintiffs and the class they represent.

\* \* \* \* \* \*

Defendants have a policy and practice of refusing to recognize the need for and provide child care services for students and of opposing all attempts to establish such services.

\* \* \* \* \* \*

Defendants' actions in denying women equal educational opportunities are arbitrary and completely unrelated to the goal of providing education. Defendants have acted knowing that the direct effect of their actions is to exclude or burden substantial numbers of women.

\* \* \* \* \* \*

By their child care policy, defendants are denying women equal access to education and are invidiously discriminating against plaintiffs and the class they represent on the basis of sex in violation of their rights to equal protection of the law.

The Supreme Court has noted that "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts." *Davis, supra,* 426 U.S. at 242, 96 S.Ct. at 2048. The primacy or exclusiveness of an invidious purpose need not be proved. Justice Powell's opinion in the *Arlington Heights* case makes this clear:

*Davis* does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes. Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the "dominant" or "primary" one. In fact, it is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality. But racial discrimination is not just another competing consideration. When there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified.

429 U.S. at 265–66, 97 S.Ct. at 563.

Determining whether invidious discriminatory purpose was a motivating factor de-

mands a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266, 97 S.Ct. at 564. The Court in *Arlington Heights* suggested a number of evidentiary sources relevant to this determination, including the existence of a "clear pattern" unexplainable on grounds other than discrimination, the historical background of a decision, the "specific sequence of events" leading up to the challenged action, and "departures" from the normal procedural sequences and substantive policies. *Id.* at 266–68, 97 S.Ct. 555. Indeed, the impact of the official action, while not the "sole touchstone" of an invidious discrimination, is not irrelevant to the question of intent, and may provide an important starting point. *Id.* at 266, 97 S.Ct. 555.

■ It is not an easy matter to state just what would constitute an "invidious purpose" in the context of this case. The search for sex-discriminatory motivation cannot halt simply upon a demonstrated absence of manifest misogyny. On the other hand, it would be inappropriate and unwise for the courts to attempt to probe the thought processes of every decision-maker with legislative or administrative responsibilities for traces of sexual bias. Precisely where, between these two untenable extremes, the proper level of judicial sensitivity is reached is a matter which must rest, in the first instance, upon the analysis and discernment which the District Judge brings to bear upon the controverted facts.[9]

It is too early in the course of this litigation, then, to determine whether the defendants' conduct was free from discriminatory purpose. The "sensitive inquiry" mandated by the Supreme Court in *Arlington Heights* cannot satisfactorily be undertaken on a motion to dismiss. While it is not clear what level of "scrutiny" is applicable on the novel facts of this case,[10] we cannot disregard plaintiffs' assertion that, in some re-

spects, defendants' actions promoted no legitimate state interest and were completely without rational basis. While these allegations may prove to be entirely conclusory, plaintiffs are entitled to an opportunity to present specific facts in their support. *See* Fed.R.Civ.P. 56(e).

■ In the event that plaintiffs are successful on remand in making a threshold showing of discriminatory purpose, it will be necessary to determine whether the injuries they claim may fairly be attributed to its improper consideration. We refer to the test of "causation," as enunciated by the Supreme Court in *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 286, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). The application of this test, which may well provide the key to an ultimate solution of this litigation, is explained in the *Arlington Heights* case, decided the same day:

> Proof that the decision by the Village was motivated in part by a racially discriminatory purpose would not necessarily have required invalidation of the challenged decision. Such proof would, however, have shifted to the Village the burden of establishing that the same decision would have resulted even had the impermissible purpose not been considered. If this were established, the complaining party in a case of this kind no longer fairly could attribute the injury complained of to improper consideration of a discriminatory purpose. In such circumstances, there would be no justification for judicial interference with the challenged decision.

429 U.S. at 270 n.21, 97 S.Ct. at 566 n.21.

## IV.

### *Title IX*

■ Plaintiffs' Title IX claim poses several difficult questions. We are met at the outset with the question of whether Title IX supplies plaintiffs with any rights they

---

**9.** The cases cited in note 3, *supra*, shed some light on factors relevant to a determination of impermissible sex-discriminatory purpose.

**10.** This Court has noted that neither "strict" nor "minimal" scrutiny provides useful guid-

ance where a nonsuspect classification allegedly operates to the detriment of a disadvantaged group. *Berkelman v. San Francisco Unified School Dist.*, 501 F.2d 1264, 1267, 1269 (9th Cir. 1974).

may enforce. The Court of Appeals for the Seventh Circuit has recently concluded that no private right of action was intended by the Congress in its enactment of Title IX and that no such right may be judicially inferred. *Cannon v. University of Chicago*, 559 F.2d 1063 (1976). However, one important difference from the case at bar renders *Cannon* an authority of limited significance.

The present action is based upon a section of the Civil Rights Act of 1871, 42 U.S.C. § 1983. While the plaintiff in *Cannon* also invoked this statute, the Seventh Circuit held that the requisite state action ingredient was absent, her suit being against a private university. In contrast, the alleged conduct of defendants here clearly constitutes state action. The consequent availability of an action under § 1983, independent of any implied private right of action under Title IX, confronts us with a question not reached by the *Cannon* court: namely, whether Title IX is to be read as establishing a right which may be vindicated by way of an action under § 1983. Although we have been unable to find any authority directly on point, we believe the answer must be in the affirmative.[11]

The Seventh Circuit in *Cannon* distinguished *Lau v. Nichols, supra*, 414 U.S. 563, 94 S.Ct. 986, 39 L.Ed.2d 1, on the ground that *Lau* had been brought under the authority of 42 U.S.C. § 1983.[12] 559 F.2d at 1083 (on rehearing). *Lau*, as we have seen, involved a claim of discrimination under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.,[13] which supplied the model for Title IX of the Education Act

Amendments of 1972. The question of whether an implied right of action lay directly under the provisions of Title VI was not presented to or decided by the Supreme Court, presumably because state action was involved and § 1983 was pleaded. A number of lower courts have also entertained private claims under Title VI in the context of § 1983 actions.[14]

Given the close relationship between Title VI and Title IX and the Supreme Court's decision in *Lau*, we conclude that it would be anomalous to deny plaintiffs here the right to raise asserted violations of Title IX in the context of their § 1983 action. Accordingly, we proceed to the question whether their allegations with respect to those asserted violations are sufficient in law to withstand a motion to dismiss.

The District Court based its dismissal of the Title IX claim on the ground that where no specific program or service is offered to either men or women no discrimination under Title IX has occurred, even if the lack of such a program or service has a disproportionate impact upon women. Congress never intended that Title IX operate to require the affirmative development of previously nonexistent educational services. If we were to accept plaintiffs' premise, the inevitable result would be judicially-imposed child care services in every community college district not already providing them. Had Congress intended such a result, we would undoubtedly have a specific mandate to that effect, probably coupled with provisions for Federal funding.

11. The Supreme Court in *Bakke, supra* note 1, citing *Lau*, assumed for the purpose of that case that the respondent had a private right of action under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. —— U.S. at ——, 98 S.Ct. 2733.

12. The Seventh Circuit also distinguished *Lau* and other cases on the ground that they involved "attempts to deprive large groups of minorities of their right to equal educational opportunities," 559 F.2d at 1072, whereas *Cannon* was a suit by a single person alleging an individual act of discrimination based on sex. The same distinction would ostensibly apply to the present case, which was brought as a class action allegedly on behalf of large numbers of

women in San Mateo County. However, the question of class certification was not reached by the District Court.

13. Title VI, 42 U.S.C. § 2000d, reads, in relevant part:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

14. For some of these cases, see footnote 5 to the opinion on rehearing in *Cannon*, 559 F.2d at 1081.

What Congress more logically intended when it enacted Title IX was that all programs and services offered be made equally available to members of both sexes.

This general line of reasoning, however, seems foreclosed by the considerations developed in section II, *ante.* The abstract similarities between the claims successfully urged in *Lau* and other cases and those alleged here are too striking to allow the dismissal of these claims to stand. We are reluctant, in the absence of any findings of fact, to formulate conclusions with respect to the legality of any particular conduct or to promulgate a standard to be applied in Title IX cases. The statute, its legislative history, and the regulations published by the Department of Health, Education and Welfare pursuant to its mandate are not, unfortunately, conclusive in the matter.[15] The jurisprudence in this general area is of very recent vintage and now in full process of development. As we have noted, the Supreme Court has employed a standard less stringent than intentional discrimination, at least for the purpose of determining whether a prima facie case has been established, under statutes similar to Title IX.[16] It is reasonable to expect additional guidance from that Court during the further development of litigation of this nature. We limit ourselves for present purposes to concluding that, just as intentional discrimination under the Equal Protection Clause cannot be ruled out, it cannot be said as a matter of law that plaintiffs would be entitled to no relief under Title IX upon proof of their allegations.

## V.

### Standing to Sue

The defendants have challenged the plaintiffs' standing to sue. There are

---

**15.** 20 U.S.C. § 1681(b), while arguably relevant, is not dispositive:

Nothing contained in subsection (a) of this section shall be interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist with respect to the total number or percentage of persons of that sex participating in or receiving the benefits of any federally supported program or activity, in comparison with the total number or percentage of persons of that sex in any community, State, section, or other area: *Provided,* That this subsection shall not be construed to prevent the consideration in any hearing or proceeding under this chapter of statistical evidence tending to show that such an imbalance exists with respect to the participation in, or receipt of the benefits of, any such program or activity by the members of one sex.

The legislative history of Title IX may be found at 1972 U.S.Code Cong. and Admin. News, p. 2462.

About three years after the passage of Title IX the Department of Health, Education and Welfare issued extensive regulations designed to effectuate the purposes of Title IX, 45 C.F.R. § 86.1 *et seq.*, entitled "Nondiscrimination on the Basis of Sex in Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance." In none of these regulations have we been able to find any reference to child care services, despite the fact that there is a section (§ 86.40) dealing with "Marital or Parental Status." Although it is for the District Court to ponder, rather than for us to suggest, an invitation extended to the Department of Health, Education and Welfare to participate as *amicus curiae* could perhaps prove useful to the resolution of the case.

**16.** The Court indicated that this was so under Title VII of the Civil Rights Act of 1964 in *Griggs, supra,* 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158. ["Good intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability."] *Griggs* remains good law in this respect; see the quote from *Dothard v. Rawlinson,* 433 U.S. at 329, 97 S.Ct. 2720, *ante* at page 52. See also *Nashville Gas Co. v. Satty, supra,* 98 S.Ct. at 352.

The Federal Government, of course, has the "power to fix the terms on which its money allotments to the States shall be disbursed," *Lau v. Nichols,* 414 U.S. at 569, 94 S.Ct. at 789, and in exercising that power Congress may impose conditions on administrative action stricter than those imposed by the Constitution. The Court in *Lau* noted that, under Title VI of the Civil Rights Act of 1964, "[d]iscrimination is barred which has that *effect* [*i. e.,* discrimination among students on account of race or national origin] even though no purposeful design is present." *Id.* at 568, 94 S.Ct. at 789. See also *Lloyd v. Regional Transportation Authority,* 548 F.2d 1277, 1284 (7th Cir. 1977) and *United Handicapped Federation v. Andre,* 558 F.2d 413, 415 (8th Cir. 1977) [affirmative duties created under § 504 of the Rehabilitation Act of 1973].

four plaintiffs presently before the court. At the commencement of this action, one of them, De La Cruz, was a prospective high school graduate not then enrolled in any college of the District, but wishing to go to college at some future time.[17] The other three plaintiffs are presently students in colleges of the District. Consequently, the defendants suggest that there is no causal relationship between any action or policy of the District and the plaintiffs' alleged lack of appropriate educational opportunities. Since the plaintiffs, the argument runs, have not been denied a college education or access to a college education because of any failure of the District to provide child-care facilities, they are suffering no deprivation of rights nor any legally cognizable injury. The motion to dismiss for lack of standing was not passed upon by the District Court, but since our jurisdiction to decide the case is implicated we are constrained to consider it.

The governing standard is clear:

For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.

*Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

Applying this principle, there can be little doubt that plaintiffs have standing to sue. They have alleged "such a personal stake in the outcome of the controversy" as to justify their "invocation of federal-court jurisdiction." *Id.* at 498–99, 95 S.Ct. at 2205, quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). They have alleged that they themselves are injured, and the complaint indicates that the alleged injury is fairly traceable to defendants' acts or omissions. *Village of Arlington Heights v. Metropolitan Housing Development Corp., supra,* 429 U.S. at 261, 97 S.Ct. at 555. Moreover, they meet the requirements enunciated by this Court in *Bowker v. Morton,* 541 F.2d 1347 (9th Cir. 1976). In brief,

plaintiffs have alleged a "particularized injury," namely, the denial of their access to higher education; this injury is asserted to have "concretely and demonstrably result[ed] from defendants' action[s]"; and the injury alleged would be "redressed by the remedy sought." *Id.* at 1349. The plaintiffs' grievances have not become any less palpable or distinct to them because they attend college or expect to go to college, nor does the fact that several have made temporary arrangements for the care of their children eliminate from the case the alleged burdens and uncertainties they claim to suffer as a result of the challenged policy. Consequently, we conclude that they are not deprived of standing to sue.

## VI.

We are not unmindful of the defendants' apprehension of a judicial usurpation of the District's functions. We suggest that this alarm may be premature. It is easy to overstate the practical effects of an ultimate decision in favor of plaintiffs in this action; nor would such effects, standing alone, necessarily warrant the denial of relief. To be sure, federal courts must show great deference to local democratic processes and refrain in most instances from interfering with decisions of school authorities. See *Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968); *East Hartford Education Association v. Board of Education,* 562 F.2d 838, 857 (2d Cir. 1977) (on rehearing *en banc* ). Mr. Justice Powell drew attention to this caution in *Frontiero v. Richardson,* 411 U.S. 677, 692, 93 S.Ct. 1764, 1773, 36 L.Ed.2d 583 (1973) (concurring opinion), when he said:

There are times when this Court, under our system, cannot avoid a constitutional decision on issues which normally should be resolved by the elected representatives of the people. But democratic institutions are weakened, and confidence in the restraint of the Court is impaired, when we appear unnecessarily to decide sensitive issues of broad social and political

---

17. We are informed by counsel for the appellants that plaintiff De La Cruz has since acquired her high school equivalency diploma and now claims to be unable to attend college because of the lack of available child care.

importance at the very time they are under consideration within the prescribed constitutional processes.

Unquestionably, however, as Justice Powell had occasion to reiterate in the *Arlington Heights* case, quoted at page 59, *ante*, there come times when judicial deference cannot be justified. Whether this lawsuit will provide such an occasion remains to be seen.[18] We emphasize, however, despite intimations to the contrary in the dissenting opinion, that judicial involvement in the general area of alleged discrimination, and indeed in this case, stems not from any *sua sponte* initiative in derogation of traditional principles, but rather from a number of relatively recent developments, including the expansion of national social legislation, the provision of federal financial support to social welfare projects, and the enunciation of novel legal theories by the Supreme Court.[19]

18. These points have been well stated in a recent lecture by a member of the federal judiciary:

> [T]he federal courts have traditionally been reluctant to intervene in the affairs and activities of the other branches of government. Such self-imposed restraints as the "case and controversy" doctrine, the "political question" doctrine, and the abstention doctrine attest to the judiciary's recognition of and respect for these venerable principles.
>
> Yet, these doctrines serve only to restrain, not to interdict, the exercise of judicial power. The authors of the Constitution never intended for these or any other doctrines to render impotent the power of the federal judiciary to restrain unconstitutional action on the part of governmental institutions.
>
> \* \* \* \* \* \*
>
> Thus, the judiciary's role as defender of the Bill of Rights and its occasional intrusion in the affairs of the legislative and executive branches of government result not from an arrogation of power but from compliance with a constitutional mandate. Those who criticize the federal courts for this occasional intrusion fail to recognize that, in the words of the French historian, Alexis de Tocqueville:
>
> > [T]he American Judge is brought into the political arena independently of his own will. He judges the law only because he is obliged to judge a case. The political question that he is called upon to resolve is connected with the interests of the parties, and he cannot refuse to decide it without a denial of justice.
>
> \* \* \* \* \* \*
>
> Thus, any doctrinal approach to interpreting the Constitution, at whichever extreme, is both inappropriate and unworkable. Adjudication of constitutional issues requires an openness of mind and a willingness to decide the issues solely on the particular facts and circumstances involved, not with any preconceived notion or philosophy regarding the outcome of the case. While a refusal to show proper deference to and respect for the acts and decisions of the coordinate branches of government is judicial intrusion and is, therefore, improper, a blind and unyielding deference to legislative and executive action is judicial abdication and is equally to be condemned.

Hon. Frank M. Johnson, Jr., The Role of the Judiciary With Respect to the Other Branches of Government, 11 Ga.L.Rev. 455, 464, 465, 468–69 (1977) (footnotes omitted).

19. [T]he past several decades have been extremely active and dynamic ones for the federal judiciary in the area of constitutional law. The general citizenry, demonstrating a new awareness of rights or increasingly affected by government controls and dependent upon government programs and services, has looked more and more to the federal courts for the guarantee of rights or for protection against unconstitutional conduct on the part of the states and federal executive and legislative branches. The organized Bar has, in the finest tradition of the legal profession, repeatedly called upon the federal courts to extend and to expand to all groups and persons in our society the freedoms and protections afforded by the Constitution. True to its constitutional imperative, the federal judiciary has responded cautiously but unwaveringly, adjudicating and upholding the rights of, among many others, black persons and women to equal educational and employment opportunities; the involuntarily committed mentally ill to minimum care and treatment; and incarcerated offenders to a safe and decent environment.

> \* \* \* \* \* \*
>
> During the past several decades . . . there have been in our society a growing awareness of and concern for the rights and freedoms of the individual. This awareness and this concern are reflected in the steady shift in emphasis in constitutional litigation from property rights to individual rights. Congress has enacted social welfare statutes in such areas as education, voting, consumer protection, and environmental protection. Speaking through these enactments, Congress has made clear its desire that freedom, justice, and equality become a reality to and for all Americans. In many instances the responsibility for seeing that this salutary goal is accomplished lies with the federal judiciary.

Johnson, *supra* note 18, 11 Ga.L.Rev. at 462–63 (footnotes omitted).

There can be little doubt that numerous problems of national importance lie under the surface of this litigation and that the plaintiffs have made a first move in an effort to compel the defendants to adopt a policy having pervasive implications for the community at large. The briefs submitted by *amici curiae* attest to this. While it may be true that the plaintiffs are disadvantaged by the burdens of child rearing in their pursuit of a college education, this hardship appears comparable to a wide spectrum of conditions afflicting many other members of the student population, such as acute impediments to sight, hearing, or mobility and a narrow margin of economic self-sufficiency requiring students to be wage earners while attending college. These are problems which go to the very core of our societal organization and which affect profound social, economic, and cultural values. Surely it is not the prerogative of the judiciary to undertake the resolution of these problems, nor to review the wisdom of legislative and administrative efforts in that direction.

A national magazine has recently reported that while it has become a focal objective among most feminist leaders to tailor their goals to the needs of both working women and homemakers, they have so far failed to obtain widespread support for child care—a facility that would help many women with the problem of juggling motherhood and work, and presumably, motherhood and college credits.[20] One major source of resistance to the public funding of child care centers has been the magnitude of the costs involved. In his veto of a 1971 bill, S. 2007, 92nd Cong., 1st Sess., which would have provided extensive child care facilities at government expense, President Nixon noted that the proposed legislation contemplated an expenditure of two billion dollars, with a prospect of costs that could eventually reach twenty billion dollars annually.[21]

While we must assume that the defendants have failed to adopt the policy advocated by the plaintiffs and have declined to undertake to provide the particular services the plaintiffs desire, we have no way to discern the true factual basis for their position. We note that the plaintiffs, in addition to requesting affirmative relief, also seek prohibitory relief against practices such as the refusal to accept funds or to allow vacant space to be used for private child care centers, which would not necessarily require District expenditures or the commitment of District time. There are many facets to the plaintiffs' allegations and only a thorough examination of the facts can properly illuminate the issues.

We of course intimate no views whatever on the merits of the claims asserted or on the propriety of any particular form of relief if those claims prove meritorious. Nor do we intend our opinion to be read as foreclosing any grounds for the termination of this case prior to trial beyond those explicitly considered herein. Conceivably, the development and refinement of the issues prior to trial may well justify the District Court in concluding, by way of summary judgment, Fed.R.Civ.P. 56, that a trial of one or more of the plaintiffs' claims would be futile and therefore unnecessary. What we do say unreservedly, however, is that this case cannot be resolved upon a construction of the pleadings.

The judgment of the District Court is reversed and the case is remanded for further proceedings consonant with this opinion.

**20.** Newsweek, Nov. 28, 1977, at 63.

**21.** 117 Cong.Rec. 46,057 (daily ed. Dec. 10, 1971). Another nationally distributed publication reported that the Federal government is now spending roughly 1.5 billion dollars a year on child care and that this cost could jump to about 25 billion dollars annually if all the wishes of child care activists were granted. Time, Dec. 5, 1977, at 25.

WALLACE, Circuit Judge, dissenting: [1]

De La Cruz and the other appellants in this case (hereinafter referred to as the plaintiffs) claim that certain officers of the San Mateo Community College District (hereinafter defendants) have discriminated against them on the basis of sex by refusing to initiate or approve the establishment of day care facilities which would benefit female college students with child-rearing responsibilities. They have asked the district court to order the defendants to vote or decide contrary to what they have done in the past on this issue so that the desired day care facilities will be promptly set in operation.

The majority acknowledges that serious implications for the role of the federal judiciary arise when we undertake to mandate solutions to the social ills portrayed by the plaintiffs. The majority nevertheless feels constrained to allow the plaintiffs their cause of action, apparently anchoring its hopes that the federal courts will not thereby become regrettably enmeshed in the formulation of local educational policy on its belief that ultimate victory for the plaintiffs on the merits may never be realized or that, if it is, the relief granted may somehow be appropriately circumscribed. I cannot join the majority, for I believe it is in the allowance of the cause of action no less than in the administration of the relief sought that the power of the federal judiciary is wrongfully invoked and governing law misconstrued. I therefore respectfully dissent.[2]

## I

The plaintiffs have failed to state a claim because they have failed to allege any act of "discrimination" within the meaning the Supreme Court attaches to that word. Until the defendants are alleged to have engaged in conduct which has discriminatory *effects,* no cause of action under either the Fourteenth Amendment or 20 U.S.C. § 1681 (Title IX) has been stated against them, and *this is so even if it is* alleged that the defendants' conduct was motivated by sexually discriminatory *intent.* Since I can find in the complaint no allegation of discriminatory effects as the term is properly understood, I conclude that the judgment of the district court should be affirmed.

The district judge concluded that since the defendants have offered no child-care program whatsoever, it is impossible for them to have discriminated with respect to such a program. The majority rejects this conclusion. Nonetheless, an examination of the decisions of the Supreme Court bearing upon the concept of "discrimination" convinces me that, as the Court understands the term, nothing approaching sex discrimination has been alleged here.

## II

Since the Equal Protection Clause and contemporary civil rights statutes merely employ or rely upon the concept of "discrimination," but do not define it, *see General Elec. Co. v. Gilbert,* 429 U.S. 125, 133, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), our most

1. Subsequent to the circulation of this dissent, the majority made substantial revisions in its opinion including elimination of certain reliance on *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974) (discussed in part IV of this dissent), and the addition of part II of the majority opinion. With the latter addition, the majority now joins me in concluding that intent to discriminate alone is insufficient under Title IX or the Fourteenth Amendment.

Having gone half way, the majority persists in finding "discrimination" alleged in the pleadings of this case and from this position, I must still dissent for the reasons set forth in footnotes 5 and 6, *infra.*

2. With respect to the other issues treated by the majority, I do not agree that De La Cruz has standing to assert this cause of action, but since I believe that at least some of the other plaintiffs do have standing, I agree that the entire case should not be dismissed on that basis. I am also persuaded that a private action based on Title IX is proper under 42 U.S.C. § 1983.

appropriate guide to the meaning of the word is the case law of the Supreme Court dealing with the Constitution and these laws.

In *Geduldig v. Aiello,* 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974), the Court held that the exclusion of pregnancy from a state-administered disability-benefits plan for private employees not covered by workmen's compensation does not "amount[ ] to invidious discrimination under the Equal Protection Clause," *id.* at 494, 94 S.Ct. at 2491, because it does not single out any person or group for inferior treatment, but is merely less inclusive of benefits than some might desire. The Court was careful to observe that the insurance coverage offered was no less valuable to women than to men. *Id.* at 496–97, 94 S.Ct. 2485.

The Court also emphasized that the pregnancy exclusion was not a classification along sexual lines:

> The lack of identity between the excluded disability and gender as such under this insurance program becomes clear upon the most cursory analysis. The program divides potential recipients into two groups—pregnant women and nonpregnant persons. While the first group is exclusively female, the second includes members of both sexes.

*Id.* at 497 n. 20, 94 S.Ct. at 2492.

The Court explicated its *Geduldig* holding in the subsequent case of *General Elec. Co. v. Gilbert, supra,* 429 U.S. 125, 97 S.Ct. 401, 30 L.Ed.2d 34, in which it decided that a private employer's exclusion of pregnancy benefits from an insurance plan covering employees was valid under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* There was "no doubt," said the Court in *Gilbert,*

> that our reason for rejecting appellee's equal protection claim in [*Geduldig*] was that the exclusion of pregnancy from cov-

erage under California's disability-benefits plan was not in itself discrimination based on sex.

. . . . .

> The Court of Appeals was therefore wrong in concluding that the reasoning of *Geduldig* was not applicable to an action under Title VII. Since it is a finding of sex-based discrimination that must trigger, in a case such as this, the finding of an unlawful employment practice under [Title VII], *Geduldig* is precisely in point in its holding that an exclusion of pregnancy from a disability-benefits plan providing general coverage *is not a gender-based discrimination at all.*

429 U.S. at 135–36, 97 S.Ct. at 407–08 (emphasis added). *Gilbert* reemphasized the importance of the fact that the insurance benefits offered to women were at least as valuable as those offered to men, and significantly, the opinion cast this observation in terms of the "discriminatory effect" concept:[3]

> As there is no proof that the package is in fact worth more to men than to women, it is impossible to find any gender-based discriminatory effect in this scheme simply because women disabled as a result of pregnancy do not receive benefits; that is to say, gender-based discrimination does not result simply because an employer's disability benefits plan is less than all-inclusive.

*Id.* at 138–39, 97 S.Ct. at 409 (footnote omitted). The Court acknowledged that the refusal to provide disability benefits for pregnancy may "impact[ ] . . . more heavily on one gender than upon the other," *id.* at 139–40, 97 S.Ct. at 410; but even though the exclusion might therefore be said to be a "cause" of the disproportionate impact, the Court nevertheless concluded that the existence of discriminatory effect is to be determined by the relative value to

---

**3.** The "discriminatory effect" idea is often identified with *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), where it was held that actionable discrimination can exist under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, even if not shown to be purposeful.

the two sexes of the *included* benefits. *Id.* As long as equality of value exists, there has simply been no sex discrimination.

*Nashville Gas Co. v. Satty,* 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977), further develops this analysis. With respect to the exclusion of pregnancy benefits from an employer's insurance plan in that case, the Court merely restated its conclusion in *Geduldig* and *Gilbert* that this "is not a gender-based discrimination at all." *Id.* at 144, 98 S.Ct. at 352. However, the Court did find that discrimination does occur when female employees returning from maternity leave are deprived of their previously accumulated seniority. The finding of discrimination, the Court explained, turns on the distinction between a benefit and a burden:

> Here . . . petitioner has not merely refused to extend to women a benefit that men cannot and do not receive, but has imposed on women a substantial burden that men need not suffer. The distinction between benefits and burdens is more than one of semantics. We held in *Gilbert* that § 703(a)(1) did not require that greater economic benefits be paid to one sex or the other "because of their different roles in the scheme of existence." But that holding does not allow us to read § 703(a)(2) to permit an employer to burden female employees in such a way as to deprive them of employment opportunities because of their different role.

*Id.* at 142, 98 S.Ct. at 351 (citation and footnote omitted).

Finally, in the recent case of *City of Los Angeles, Dep't. of Water and Power v. Manhart,* 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978), the Supreme Court set forth what it termed a "simple test" for the existence of sex discrimination: "whether the evidence shows 'treatment of a person in a manner which but for the person's sex would be different.'" *Id.* at 1377 (footnote omitted). While that test is not cast in terms of the exclusion of benefits or the imposition of burdens, it seems closely akin to the inquiries for discriminatory effect made in *Geduldig, Gilbert* and *Satty;* in testing for discrimination, it is what is actually done to a person which counts, not what might have been done.

To the extent they have been considered thus far, these cases teach two important lessons. The first is that under either the Fourteenth Amendment (as in *Geduldig*) or the civil rights statutes (as in *Gilbert* and *Satty*) "it is a finding of sex-based discrimination that must trigger . . . the finding of an unlawful employment practice."[4] *General Elec. Co. v. Gilbert, supra,* 429 U.S. at 136, 97 S.Ct. at 408. Such discrimination may consist of "either facial discrimination or discriminatory effect." *City of Los Angeles, Dep't. of Water & Power v. Manhart, supra,* 98 S.Ct. at 1379 n.29 (interpreting *Gilbert*).

The second, and for present purposes more significant, contribution of these cases is a functional definition of the concept of "discriminatory effect." Discriminatory effect is shown if the benefits and opportunities offered to women are less valuable than those offered to men. Stated in terms of the benefit-burden analysis, a discriminatory effect is shown if existing benefits and

---

**4.** This quotation from *Gilbert* refers directly, of course, to Title VII; but that it applies equally to the Equal Protection Clause and, indeed, to Title IX and other anti-discrimination statutes, is apparent not only from the manner in which the *Gilbert* analysis is closely patterned after the reasoning in *Geduldig,* but also from the virtually tautological idea that only conduct found to be "sex-based discrimination" can be violative of any text forbidding sexually unfair treatment. There is simply no reason that what constitutes discriminatory effects under the Fourteenth Amendment and Title VII does not also do so under Title IX.

Under Title VII, as interpreted in *Griggs v. Duke Power Co., supra,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158, discriminatory effect alone, without reference to intent, may support a finding of illegality. Even if that rule also governs Title IX, a point I need not reach, it is of no help to the plaintiffs here since, as shown in part IV, no such effects have been alleged. *See Gilbert,* 429 U.S. at 136–37, 97 S.Ct. 401.

opportunities are restricted or withheld in such a way as to make them less available to all or many members of one sex. But discriminatory effect is not shown by a mere refusal to extend additional benefits if existing ones are equally available and valuable to men and women; in that case, women are not being treated differently than would be so if they were men, and vice versa.

I do not suggest that the approach to discriminatory effect taken from these cases is necessarily exclusive of other ways in which the concept can or should be considered. Within the broad range of circumstances in which claims of discrimination arise, it is not unlikely that the test for discriminatory effects will sometimes require a different formulation than that discussed here. But the analyses in *Geduldig, Gilbert, Satty,* and *Manhart* are entirely adequate to dispose of the present case,[5] as I explain in part IV. Indeed, even in the realm of race discrimination, where judicial protection against unfair treatment has long been at its height, the Supreme Court

has apparently applied this approach to the actions of local officials.

In *Palmer v. Thompson,* 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971), enforced racial segregation of municipal swimming pools in Jackson, Mississippi had been prohibited by a federal court. Rather than desegregate, the city closed the pools. The Supreme Court held that this closure was beyond the reach of the Equal Protection Clause on the same basis that the absence of sex discrimination was found in *Geduldig* and *Gilbert* :

> Here the record indicates only that Jackson once ran segregated swimming pools and that no public pools are now maintained by the city. Moreover, there is no evidence in this record to show that the city is now covertly aiding the maintenance and operation of pools which are private in name only. *It shows no state action affecting blacks differently from whites.*
>
> . . . [T]he issue here is whether black citizens in Jackson *are* being denied

---

**5.** I cannot accept the majority's contention in footnote 6, *ante* at 54, that the holdings of *Geduldig* nor *Gilbert* apply only to facially discriminatory acts. I agree that neither *Geduldig* and *Gilbert* foreclosed proof of a discriminatory effect. Nonetheless, *Geduldig* contemplated proof of a discrepancy in the aggregate risk protection derived from the insurance program at issue. 417 U.S. at 496, 94 S.Ct. 2485. Similarly, in *Gilbert,* only a discrepancy in the value of the included benefits—the "package"—to men and women was contemplated as proof of such an effect. *See* 429 U.S. at 138–40, 97 S.Ct. 401. The discussion of *Gilbert* in *Satty* reaffirmed this principle. *See* 434 U.S. at 144, 98 S.Ct. 347.

In contrast, plaintiffs here challenge the impact of the defendants' policy on women as a group but not any inequality in the value of the benefits the defendants currently provide. Under *Gilbert,* the latter, but not the former, is actionable. *See* 429 U.S. at 139–40, 97 S.Ct. 401.

The majority now seeks to characterize the complaint as one challenging the value of the included benefits. *Ante* at 56. Such a characterization is no more than a relabeling of the true substance of the complaint, that the defendants' failure to provide child care has an adverse impact on women. There is no allega-

tion in the complaint that the value of the benefits currently provided by the defendants is actually greater for men than it is for women, as required by *Gilbert.* To measure the value of existing, included benefits by assessing the adverse impact of excluded benefits would render meaningless the *Gilbert* distinction.

For purposes of burden analysis, unlike the analysis of included benefits, the totality of the defendants' conduct may be considered, as my discussion of *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974), in part IV demonstrates. Even under this standard, however, plaintiffs fail to allege discriminatory effects. I do not find in the complaint the totality of conduct that formed the basis for the Court's decision in *Lau.* The majority's hypothetical, *ante* at 57–58, goes far beyond the allegations in the complaint and simply is not before us.

Finally, I cannot accept the majority's distinction of *Geduldig, Gilbert, Satty* and *Palmer v. Thompson,* 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971), as cases decided on a full record. Because allegations in a complaint are to be taken as true for purposes of a motion to dismiss, *Gardner v. Toilet Goods Ass'n,* 387 U.S. 167, 172, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967), the legal principles established in those cases must control our decision.

their constitutional rights when the city has closed the public pools to black and white alike. Nothing in the history or the language of the Fourteenth Amendment nor in any of our prior cases persuades us that the closing of the Jackson swimming pools to all its citizens constitutes a denial of "the equal protection of the laws."

403 U.S. at 225–26, 91 S.Ct. at 1945 (emphasis partly added). Thus, the Court was convinced that since the city had no constitutional duty to operate swimming pools, and since all existing public facilities were offered equally to blacks and whites, *id.* at 220, 91 S.Ct. 1940, no discrimination had occurred.[6]

This approach to the concept of discriminatory effect has much to recommend it, for it focuses on the actual treatment one receives at the hands of an alleged discriminator. It is equally important for what it excludes from the definition of discriminatory effect. Although the decision of a government body not to initiate or support a particular social or economic program can certainly be said to have an effect or impact upon those who would be its beneficiaries, to say that such an effect or impact is "discriminatory" merely because a certain group would have benefited from it more than others is a quantum jump from the traditional understanding of discrimination. The Court recognized this in *Gilbert* when it said that purporting to find discrimination in the refusal to add pregnancy disability benefits to an otherwise nondiscriminatory insurance plan "would endanger the commonsense notion that an employer who has no disability benefits program at all does

not violate Title VII . . . ." 429 U.S. at 139, 97 S.Ct. at 410.

As I shall explain in discussing *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974), the mere refusal to act does not always exclude the possibility that one has discriminated. But this does not disturb the important teaching of the cases discussed above that discriminatory effects exist only when one's conduct unevenly restricts, burdens, or limits the opportunities and benefits that should be made equally available to a particular group of people, but not when one declines to extend an additional benefit of disproportionate value to certain members of that group. This concept, obviously, has direct application to the case before us.

### III

There remains the thorny question of the role of discriminatory intent in defining discrimination. I believe the precise issue presented by this case is whether, in the absence of facial discrimination or conduct having discriminatory effects, improper intent can turn otherwise gender-neutral behavior into actionable "discrimination" under Title IX or the Fourteenth Amendment. While *Geduldig, Gilbert,* and *Satty* contain statements bearing on this problem, that language can best be interpreted by a brief review of the Court's earlier treatment of this subject.

As commentators[7] and at least one Supreme Court justice[8] have observed, the Court has not developed a unified, consistently applied doctrine respecting the role of

---

6. In footnote 7, *ante* at 55, the majority attempts to limit the holding of *Palmer* to the proposition that discriminatory intent alone is insufficient to invalidate a statute. Nonetheless, only by holding that the closing of the swimming pools had no discriminatory effect did the Court reach the question whether improper racial considerations alone could invalidate the action. *See* 403 U.S. at 224–26, 91 S.Ct. 1940. Indeed, as I note in part III, *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), later characterized *Palmer* as holding in part that the action had no dis-

criminatory effect. 426 U.S. at 243, 96 S.Ct. 2040.

7. *See* Brest, *Palmer v. Thompson: An Approach to the Problem of Unconstitutional Legislative Motive,* 1971 S.Ct.Rev. 95, 99; Ely, *Legislative and Administrative Motivation in Constitutional Law,* 79 Yale L.J. 1205, 1208–12 (1970).

8. *Beer v. United States,* 425 U.S. 130, 148–49 n.4, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976) (Marshall, J., dissenting).

legislative motive in determining the constitutionality of the acts of state and federal officials. On the other hand, it cannot be gainsaid that the Court has often and emphatically declared that otherwise valid legislation is not rendered invalid solely because the motives that prompted its enactment were wrongful or even corrupt. As early as 1810, the Court, speaking through Chief Justice Marshall, said:

> [If] a legislative act, which the [state] legislature might constitutionally pass, . . . be clothed with all the requisite forms of a law, a court, sitting as a court of law, cannot sustain a suit brought by one individual against another, founded on the allegation that the act is a nullity, in consequence of the impure motives which influenced certain members of the legislature which passed the law.

*Fletcher v. Peck,* 10 U.S. (6 Cranch.) 87, 131, 3 L.Ed. 162 (1810). This principle has been repeatedly reaffirmed. *Palmer v. Thompson, supra,* 403 U.S. at 224, 91 S.Ct. 1940; *United States v. O'Brien,* 391 U.S. 367, 383, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); *Arizona v. California,* 283 U.S. 423, 454–55, 51 S.Ct. 18, 75 L.Ed. 717 (1931); *McCray v. United States,* 195 U.S. 27, 53–56, 24 S.Ct. 769, 49 L.Ed. 78 (1904). Indeed, it has been termed a "fundamental principle of Constitutional adjudication" that the courts "will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien, supra,* 391 U.S. at 383, 88 S.Ct. at 1682.[9]

Significantly, the Court did not hesitate to apply this principle in *Palmer,* a case in which racial discrimination by local officials was alleged. In rejecting the charge that the closure of the swimming pools in that case was illegal because "motivated by a desire to avoid integration of the races," 403 U.S. at 224, 91 S.Ct. [1940], at 1944, the Court relied directly upon the line of cases referred to above. *Id.*

9. When the question before the courts involves the proper *interpretation,* as opposed to the *validity,* of a statute, of course, inquiry into legislative purpose and intent is common "because the benefit to sound decision-making in this circumstance is thought sufficient to risk the possibility of misreading Congress' purpose," *United States v. O'Brien, supra,* 391 U.S. at 383–84, 88 S.Ct. at 1683, and because in seeking to implement rather than pass judgment upon legislative intent, the danger of judicial intrusion into the legislative sphere, discussed in the subsequent text, is muted. It might also be argued that when the courts search for state interests under either "minimum" or "strict" scrutiny equal protection analyses they necessarily examine legislative motive. But "state interests" must, in many cases, be much more encompassing than the motives of all or some of the legislators who act to further those interests; thus, evaluating the legitimacy of state interests is not identical to passing judgment on legislators' motives. *Cf. Bulluck v. Washington,* 152 U.S.App.D.C. 39, 45–46, 468 F.2d 1096, 1102–03 n.17 (1972) ("To the extent that the 'interests' advanced by a statute are equated with the 'purposes' for its enactment, the latter may become relevant [to its validity]"). Further, what is said in the subsequent text concerning the search for discriminatory intent as required by *Washington v. Davis, supra,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597, applies here as well: the courts avoid many of the inherent dangers involved in scrutinizing legislators' motives if they insist that a threshold showing or allegation of discriminatory effect be made. In sum, I find judicial inquiries into legislative motive for purposes of statutory interpretation or discovery of state interests to be categorically distinct from such inquiries when designed to approve or disapprove of legislative choices solely on the basis of that motive. It is judicial review of the latter type that I believe is the object of condemnation in the *Fletcher-Palmer* line of cases cited in the text.

That an illicit legislative motive will not undermine an otherwise valid law is related to the broader, frequently reiterated principle that the courts do not inquire into the wisdom or utility of legislation under constitutional attack. *E.g., James v. Strange,* 407 U.S. 128, 133, 92 S.Ct. 2027, 32 L.Ed.2d 600 (1972); *Joseph E. Seagram & Sons, Inc. v. Hostetter,* 384 U.S. 35, 46–47, 86 S.Ct. 1254, 16 L.Ed.2d 336 (1966); *Ferguson v. Skrupa,* 372 U.S. 726, 730, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963). Important to the discussion here, however, is that, as illustrated by such cases as *Fletcher, O'Brien,* and *Palmer,* cited in the text, it is not only unwise, but also illicit motivation that is beyond the reach of the courts if a legislative act is otherwise nondiscriminatory.

The issue before us is a relatively narrow one,[10] making it unnecessary to interpret or reconcile all the cases in which the Court has discussed the issue of legislative motive. We are confronted with what the plaintiffs portray as a rather straightforward discrimination question, and as far as the role of legislative motive is concerned, I do not believe it is distinguishable in principle from *Palmer*.[11] The question thus becomes whether any subsequent Supreme Court decision has undermined the holding in *Palmer* that a discriminatory intent is irrelevant to the validity of otherwise nondiscriminatory action by local officials.

In its recent decision in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), the Supreme Court answered affirmatively the question whether discriminatory motive must be proven in order to invalidate state action under the Equal Protection Clause.[12] The Court held that constitutionally-based discrimination claims require a showing not only of discriminatory effects, but also of discriminatory intent. Dicta in *Palmer* suggesting that intent is never relevant were disapproved. 426 U.S. at 243, 96 S.Ct. [2040] at 2049. But *Davis* did not purport to disturb *Palmer's* holding, which it characterized in part as a finding that "the city was . . .

extending identical treatment to both whites and Negroes." *Id.*

*Davis* and *Palmer* are easily harmonized, and taken together they clearly establish the rule that governs this case. From *Palmer* we learn that if no discriminatory effects have been shown, discriminatory intent cannot affect the constitutional validity of the decisions of local officials. *Davis*, in turn, teaches that once discriminatory effects *are* present,[13] intent becomes very important. The synthesis, of course, is that it is only *after* discriminatory effects are shown that intent becomes relevant to the validity of a legislative or administrative act.

Several fundamental policies undergird the Court's consistent refusal to invalidate the decisions of federal or local officials solely because of the motives that may have prompted them. One is the inherent difficulty in determining and evaluating the officials' purposes. Another is the futility of invalidating an act whose only vice lies in the bad motives of the actors, since the act could simply be repeated under the cover of a "sanitized" record of motivation. *See, e. g., Fletcher v. Peck, supra,* 10 U.S. (6 Cranch) at 130, 3 L.Ed. 162; *Palmer v. Thompson, supra,* 403 U.S. at 224–25, 91 S.Ct. 1940. Finally, and to my mind most

---

**10.** We are not concerned, for example, with Free Exercise or Establishment Clause adjudication, see *Board of Educ. v. Allen*, 392 U.S. 236, 243, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968); *School Dist. v. Schempp*, 374 U.S. 203, 222, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); *McGowan v. Maryland*, 366 U.S. 420, 453, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961), or with the Fifteenth Amendment and the legislation implementing its protections. *See Richmond v. United States*, 422 U.S. 358, 378–79, 95 S.Ct. 2296, 45 L.Ed.2d 245 (1975); *Wright v. Rockefeller*, 376 U.S. 52, 56 (1964); *Gomillion v. Lightfoot*, 364 U.S. 339, 341, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960).

**11.** This is obvious with respect to the Fourteenth Amendment issue in this case, since *Palmer* was decided under the Equal Protection Clause. I believe it is also true with respect to the Title IX issue. In the absence of a legislative mandate to the contrary—and I find none in Title IX—the authority and policies dis-

cussed in the text against the invalidation, based solely on motive, of legislative decisions are as persuasive as applied to judicial review under acts of Congress as under the Equal Protection Clause.

**12.** *Davis* was actually decided on the basis of the equal protection component that the Court has found to be inherent in the Due Process Clause of the Fifth Amendment and not directly under the Equal Protection Clause of the Fourteenth Amendment itself. But the opinion makes clear that the rule announced in the case applies equally to the Fifth and Fourteenth Amendments. *See* 426 U.S. at 239, 96 S.Ct. 2040.

**13.** In *Davis*, the discriminatory effect consisted of the disproportionate exclusion of blacks applying for positions on the Washington, D. C. police force by means of a written examination.

substantial, is that whenever the federal judiciary begins to probe the motives of state officials or members of the coordinate branches of the federal government, serious questions arise about whether the constitutionally prescribed limits of the judicial branch have been exceeded. *McCray v. United States, supra,* 195 U.S. at 27, 24 S.Ct. 769.[14]

In cases such as *Davis,* where the existence of a certain legislative motive has been declared to be a necessary element of a prima facie case, the courts must, of course, inquire whether that intent exists. As I have said, however, that inquiry need not be made until a threshold showing—or, in the case of judgment on the pleadings, an allegation—of discriminatory effect has been made.

Insisting that a plaintiff surmount that threshold is precisely what safeguards against judicial excess. Once a state or a parallel branch of the federal government has actually treated someone in a racially or sexually uneven way, it is likely in many cases that constitutional or statutory bounds placed on the actor have been breached, and guarding against such excesses is, of course, precisely what civil rights adjudication is about.

Should the judiciary intervene before the threshold of unequal treatment is crossed, however, and extend its power of judicial review to cases where treatment is not unequal, but motive may be impure, then the courts are, in effect, passing judgment on the character and qualifications of the officers themselves and the government bodies through which they act rather than upon their official acts. In such matters, legislators and administrators are accountable only to their constituents or superiors and their consciences. Making them also accountable to the judiciary is precisely the abuse against which the Court in *McCray* warned.[15] There, the Court acknowledged,

---

**14.** As articulated by the first Mr. Justice White in his opinion for the Court in *McCray*:

It is, however, argued, if a lawful power may be exerted for an unlawful purpose, and thus by abusing the power it may be made to accomplish a result not intended by the Constitution, all limitations of power must disappear, and the grave function lodged in the judiciary, to confine all the departments within the authority conferred by the Constitution, will be of no avail. This, when reduced to its last analysis, comes to this, that, because a particular department of the government may exert its lawful powers with the object or motive of reaching an end not justified, therefore it becomes the duty of the judiciary to restrain the exercise of a lawful power wherever it seems to the judicial mind that such lawful power has been abused. But this reduces itself to the contention that, under our constitutional system, the abuse by one department of the government of its lawful powers is to be corrected by the abuse of its powers by another department.

The proposition, if sustained, would destroy all distinction between the powers of the respective departments of the government, would put an end to that confidence and respect for each other which it was the purpose of the Constitution to uphold, and would thus be full of danger to the permanence of our institutions.

*Id.* 195 U.S. at 54–55, 24 S.Ct. at 776.

**15.** The protection of legislative independence against judicial interference is represented in the text of the Constitution as well as its structure. The Speech and Debate Clause, U.S. Const. Art. I, § 6, cl. 1, has been interpreted to protect members of Congress from civil or criminal liability for their conduct falling within the "sphere of legitimate legislative activity." *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 501–03, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975).

The purpose of the Clause is to insure that the legislative function the Constitution allocates to Congress may be performed independently.

"The immunities of the Speech or Debate Clause were not written into the Constitution simply for the personal or private benefit of Members of Congress, but to protect the integrity of the legislative process by insuring the independence of individual legislators."

In our system "the clause serves the additional function of reinforcing the separation of powers so deliberately established by the Founders."

*Id.* at 502, 95 S.Ct. at 1820 (citations omitted). The Court has emphatically declared that the protection of such values justifies excluding judicial inquiry into legislators' motives:

Our cases make clear that in determining the legitimacy of a congressional act we do not look to the motives alleged to have prompted

that if there be no authority in the judiciary to restrain a lawful exercise of power by another department of the government, where a wrong motive or purpose has impelled to the exertion of the power, that abuses of a power conferred may be temporarily effectual. The remedy for this, however, lies, not in the abuse by the judicial authority of its functions, but in the people, upon whom, after all, under our institutions, reliance must be placed for the correction of abuses committed in the exercise of a lawful power.

195 U.S. at 55, 24 S.Ct. at 776.[16]

It thus seems clear to me that, at least as far as administrative, legislative, or quasi-legislative federal and state officials are concerned, the Supreme Court continues to respect the principle that an action or decision which in its actual effects is inoffensive cannot be impeached because of the motives of those who prescribed it.[17] Such protection of the affirmative acts of public officials must, of course, apply with at least equal strength to decisions not to take action. Against this background, I return to *Geduldig, Gilbert* and *Satty* to determine

whether anything in those decisions has altered this principle.

The plaintiffs assert that these cases say that a discriminatory motive is sufficient to make the defendants' "facially neutral"[18] conduct illegal. This argument stems from a footnoted comment in *Geduldig*, which was repeated in both *Gilbert* and *Satty*, in which it is suggested that the insurance exclusions in those cases might be illegal if there were "a showing that *distinctions* involving pregnancy are mere pretexts designed to *effect* an invidious *discrimination* against the members of one sex or the other." 417 U.S. at 496–97 n. 20, 94 S.Ct. at 2492 (emphasis added); *accord, Nashville Gas Co. v. Satty, supra,* 434 U.S. at 144, 145, 98 S.Ct. 347; *General Elec. Co. v. Gilbert, supra,* 429 U.S. at 135, 136, 97 S.Ct. 401.

As the Court emphasized in *Gilbert*, the "distinction involving pregnancy" in these cases is "not a gender-based discrimination at all," 429 U.S. at 136, 97 S.Ct. at 408, since it has no discriminatory effects. *Id.* at 137–38, 97 S.Ct. at 409 ("As there is no proof that the package is in fact worth more to men than to women, it is impossible to find

---

it. In *Brewster, [U. S. v. Brewster,* 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507] we said that "the Speech or Debate Clause protects against inquiry into acts that occur in the regular course of the legislative process *and into the motivation for those acts.*" And in *Tenney v. Brandhove* we said that "[t]he claim of an unworthy purpose does not destroy the privilege." If the mere allegation that a valid legislative act was undertaken for an unworthy purpose would lift the protection of the Clause, then the Clause simply would not provide the protection historically undergirding it. "In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed." *Id.* at 508–09, 95 S.Ct. at 1824 (emphasis in original, citations omitted). Significantly, the Court has extended the reach of the Speech and Debate Clause to the states by finding an implied, congressionally-created immunity for state legislators from actions under 42 U.S.C. § 1983. *Tenney v. Brandhove,* 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951).

**16.** I find unpersuasive Professor Brest's rather cursory argument to the contrary. Brest, *supra* note 4, at 128–30. Proving discriminatory

motive by clear and convincing evidence does nothing to lessen the magnitude of the judicial intrusion into other branches of government.

**17.** The lower courts have also recognized that "if what the legislature has done is constitutional, the reasons why it has done so are irrelevant." *Bulluck v. Washington, supra,* 152 U.S.App.D.C. at 45, 468 F.2d at 1102 (footnote omitted); *accord, Felix v. Young,* 536 F.2d 1126, 1133 n. 15 (6th Cir. 1976).

I believe that this rule should apply with equal force to charges of discrimination against private parties, but since the defendants in this case are local public officials, that question need not be reached.

**18.** The term "facially neutral" should be used cautiously because it may describe at least two distinct kinds of behavior: (1) that the conduct in question is not based on overt racial, sexual, or other classifications, yet still generates discriminatory effects, and (2) that the conduct cannot be said to have discriminatory effects at all. I find the defendants' alleged conduct to be facially neutral in the latter sense, as explained in part IV of the text. The majority apparently believes the complaint alleges action which is facially neutral in the former sense.

any gender-based discriminatory effect in this scheme . . . ."). Thus, the thrust of the "mere pretext" statement is that a nondiscrimination is legal unless it is a pretext designed to effect a discrimination. This is far from clear, but to me it does not say that the mere addition of bad intent transforms nondiscrimination into discrimination. It strains credulity to believe that with one cryptic remark the Court has discarded the firmly entrenched line of authority that discriminatory motive alone cannot invalidate an act which has no discriminatory effects. Rather, the "mere pretext" statement can be interpreted to mean that if otherwise nondiscriminatory conduct contributes to or is part of a broader scheme or pattern of conduct which ultimately *is* discriminatory, then a discrimination has been "effected." [19] In that event, otherwise innocuous conduct may become illegal.[20]

This approach finds support in Justice Powell's concurrence in *Satty*. 434 U.S. at 146, 98 S.Ct. 347. He agreed that the exclusion of pregnancy benefits in that case was, by itself, indistinguishable from the plans upheld in *Geduldig* and *Gilbert*. But, he observed, perhaps the plaintiffs could prove that the ultimate effect of the employer's policies, including the pregnancy exclusion, was to make the total compensation paid to women less valuable than that paid to men. If so, there would be a discriminatory burden, as discussed above, and the plaintiffs would be able to avoid the result in *Geduldig* and *Gilbert*. Although the majority did not adopt Justice Powell's opinion, I find nothing in *Satty* that rejects the idea that it is only as nondiscriminatory

conduct is insinuated in a larger, wrongful scheme that it becomes illegal.

Thus, I would read the "mere pretext" statement to require, in any event, a showing that a *discrimination* has been effected, *i. e.*, that there is an inequality, running along sexual lines, in the treatment, compensation, or opportunity offered by the employer.[21] If this interpretation seems difficult, I believe it is less so than the alternative, which is that the Supreme Court believes that the even-handed distribution of benefits to men and women suddenly becomes invidious discrimination if it is shown that the failure to bestow additional benefits was improperly motivated. In light of the case law on legislative motive discussed above and the great stress *Geduldig, Gilbert,* and *Satty* all place on the fact that existing benefits were distributed equally with respect to gender, I do not believe the Court would approve such a result.

## IV

It remains to apply the principles developed above to the present case. In order to state a cause of action, the plaintiffs must at least allege conduct by the defendants which either discriminates against women on its face or has sexually discriminatory effects. If this is not done, additional allegations of discriminatory intent have no significance.

The complaint makes no reference to any facial discrimination, but merely lists nine separate factual events in addition to the allegations of intent.[22] For present pur-

---

**19.** As the Court put it in *Gilbert*, "a distinction which on its face is not sex related might nonetheless violate the Equal Protection Clause if it were in fact a subterfuge *to accomplish* a forbidden discrimination." 429 U.S. at 136, 97 S.Ct. at 408 (emphasis added).

**20.** The mere fact that conduct discriminates does not, of course, make it per se unlawful. There may be valid defenses to the discrimination.

**21.** *City of Los Angeles, Dep't of Water and Power v. Manhart, supra,* 98 S.Ct. 1370, offers implicit support to this reading. In *Manhart,* the Court points out that the plaintiffs in *Gil-*

*bert* "not only had . . . failed to establish a prima facie case by proving that the plan was discriminatory on its face, but they had also failed to prove any discriminatory effect." *Id.* at 1379 (footnote omitted). Nowhere does *Manhart* suggest that a prima facie case might also have been made out had discriminatory purpose alone been proved.

**22.** The allegations of discriminatory intent are set forth in the majority's opinion. It is not clear to me whether the plaintiffs have alleged that the defendants *desired* that women should suffer from the lack of day care facilities, or merely that they *were aware* of that result. I

poses, of course, I assume all the allegations to be true. Each event consists purely of a refusal by the defendants to initiate or approve any new day care arrangements that require district approval. There is alleged no move by the defendants to interfere with or to restrict any existing day care opportunities. Nor is there any allegation of other conduct which, when considered together with the day care decisions, would have the effect of impairing women's access to college programs or making them inherently less valuable or less available to women. There is no suggestion that, had they been men, the plaintiffs would have been treated differently.

As was true in *Geduldig* and *Gilbert*, the problem is solely one of underinclusiveness, and for that reason the analysis of discriminatory effects developed in those cases is applicable here. Because of a totally external and independent social condition, the plaintiffs face personal obstacles that would be eased were the defendants to extend a benefit in addition to those presently offered. But, as *Gilbert* explains, this does not constitute a discriminatory effect "even though the 'underinclusion' [of benefits] impacts, as a result of [child-rearing responsibilities], more heavily upon one gender than upon the other." 429 U.S. at 139–40, 97 S.Ct. at 410.

The plaintiffs go to great lengths to cast the defendants' conduct as an affirmative policy. No matter how distasteful or even reprehensible a "policy" may be, however, it amounts to nothing more than bare motivation until some act with discriminatory effects is committed. No such act is alleged.

Thus, nothing in the complaint suggests anything other than a gender-neutral administration of the community college district; an inference of sex discrimination is simply not to be found in this case. Therefore, the allegations of discriminatory intent are irrelevant.

My conclusion that the defendants must prevail follows *a fortiori* from the decisions in *Geduldig, Gilbert,* and *Satty.* In those cases, the defendants had become deeply involved in the disability insurance area and had excluded pregnancy benefits from an otherwise nearly-comprehensive insurance plan. The pregnancy exclusion related directly to a condition that inherently and exclusively pertains to women. In this case, by contrast, the defendants and their college district have historically had no involvement whatsoever with the day care problem, and child-rearing responsibilities are far less gender-specific than is pregnancy, affecting some men as well as women. If the pregnancy exclusion in *Geduldig, Gilbert,* and *Satty* was not discrimination, the alleged conduct of the defendants here most certainly was not.

The contrast with *Palmer* is similarly instructive. In *Palmer,* the city had previously operated swimming pools, but on a racially segregated basis. The Supreme Court found that in the withdrawal of those facilities from public use no unequal treatment, and thus no discrimination, resulted. Here, by contrast, the defendants have withdrawn no previously offered benefits, but have simply chosen to remain uninvolved in a service with which they have never had any connection.

It is also clear that *Lau v. Nichols, supra,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1, does not require a different result. In *Lau,* San Francisco public schools had been integrated by federal court decree. As a result, 2800 students of Chinese ancestry who

believe that only the former mental state qualifies as discriminatory intent within the meaning of *Washington v. Davis, supra,* 426 U.S. at 229, 96 S.Ct. 2040. *See United Jewish Organizations v. Carey,* 430 U.S. 144, 179–80, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977) (Stewart, J., concurring); *United States v. South Carolina,* 445 F.Supp. 1094, 1102 (D.S.C.1977) (three-judge district court). The reason for this should be obvious. If mere knowledge of a discriminatory effect were sufficient to satisfy the intent requirement, a premium would thereby be placed on ignorance of the very conditions that need correcting. Despite the complaint's ambiguity in this respect, however, I am prepared to assume, for purposes of this opinion, that the requisite discriminatory intent has been alleged.

could not speak English found themselves in English-speaking schools. Supplemental language courses were offered to only 1000 of these students. The Supreme Court held that the school district's failure to provide some means of overcoming this handicap violated section 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (which was the model for Title IX).

The factors in *Lau* which are relevant to the issue at hand were that public schools were involved and attendance for children between the ages of six and sixteen was mandatory, 414 U.S. at 566, 94 S.Ct. 786; the Chinese-speaking students were required to attend the English-speaking schools by federal court decree; California law provided that "English shall be the basic language of instruction in all schools," and that "the policy of the state" was to insure the "mastery of English by all pupils in the schools," *id.* at 565, 94 S.Ct. at 788; it also stated that candidates for high school graduation would be required to meet standards of proficiency in English. *Id.* at 566, 94 S.Ct. 786.

*Lau* is thus a classic example of discriminatory effect being found in the totality of the defendants' conduct. Surely it cannot be said that suddenly requiring Chinese-speaking students to attend schools where proficiency in English is mandatory, then refusing to help them overcome the consequent language handicap does not impose a "burden" on them as the term is used in *Satty*. Having entered into the venture of mandatory, English-oriented primary and secondary education, the state was not free to omit the very instruction upon which success in the system inherently depended for the minority students suddenly thrust into it.

*Lau* is a far cry from the present case, where college attendance is not mandatory

and is not as critical for success in life as is grade and high school education. Securing a college education may be more difficult when combined with child-care responsibilities, but the defendants have not declared that, in order to graduate, female students with children must eliminate that circumstance from their lives. In short, the plaintiffs in *Lau* had a discriminatory burden imposed upon them; the plaintiffs in this case, even assuming their complaint to be true, have not.

The plaintiffs air problems of significance about which society should be genuinely concerned. "But the Constitution [and, I believe, Title IX, do] not provide judicial remedies for every social and economic ill." *Lindsey v. Normet*, 405 U.S. 56, 74, 92 S.Ct. 862, 874, 31 L.Ed.2d 86 (1972).[23] I am unwilling that, in its eagerness to see the plaintiffs' difficulties eased, the court should ignore the historic and constitutional boundaries that protect not only the autonomy of the states and coordinate branches of the federal government, but ultimately the federal judiciary itself. The plaintiffs' remedy, if one is to be found,

lies, not in the abuse by the judicial authority of its functions, but in the people, upon whom, after all, under our institutions, reliance must be placed for the correction of abuses committed in the exercise of a lawful power.

*McCray v. United States, supra*, 195 U.S. at 55, 24 S.Ct. at 776.

---

**23.** If all it takes to state a cause of action under the Fourteenth Amendment are allegations (1) that someone acting under color of state authority has refused to take an action which would be especially helpful to a certain category of persons, most of whom are women, and (2) that the refusal was discriminatorily motivated, I fail to see why a host of other possible welfare or economic proposals might not be subject to judicial creation if a federal judge is convinced that the defendant is biased against women. Such "judicial activism" in the name of "equal protection" would distort the concept beyond recognition.