587 F.2d 1022
 GUADALUPE ORGANIZATION, INCORPORATED, a Non-Profit Arizona
Corporation, on behalf of its members and the
Community of Guadalupe, et al.,
Plaintiffs- Appellants,
v.
TEMPE ELEMENTARY SCHOOL DISTRICT NO. 3 et al., Defendants-Appellees.
 No. 76-2029.
 United States Court of Appeals,
Ninth Circuit.
 Dec. 18, 1978.
 
 Appeal from the United States District Court for the District of arizona.
 Before CHOY and SNEED, Circuit Judges, and SPENCER WILLIAMS,* District Judge.
 SNEED, Circuit Judge:
 
 
 1
 This appeal is from the district court's adverse determination of a civil rights class action filed by plaintiff-appellants to compel the Tempe Elementary School District No. 3 to provide all non-English-speaking Mexican-American or Yaqui Indian students attending district schools with bilingual-bicultural education. Appellants assert that their rights to equal educational opportunity have been disregarded in violation of the Equal Protection Clause of the Fourteenth Amendment and that the school district's failure to provide bilingual-bicultural education also violates rights granted by Section 601 of the Civil Rights Act of 1964, the Equal Education Opportunity Act of 1974 and Title 42 U.S.C. § 1983. The district court granted appellees' motion for summary judgment. Jurisdiction is conferred by 28 U.S.C. § 1291. We affirm.
 
 I.
 FACTS.
 
 2
 Appellants are elementary school children of Mexican-American and Yaqui Indian origin or their representatives of the community of Guadalupe, Arizona, a semi-rural community of approximately 5,000 people, most of whom are Mexican-American or Indian. Plaintiffs allege that of the approximately 12,280 students in the Tempe Elementary School District No. 3, approximately 18% Are Mexican-American or Yaqui Indian, and that in the elementary school in Guadalupe, approximately 554 of 605 students are Mexican-American or Yaqui Indian. Appellants allege four discriminatory acts constituting the violation of their rights:
 
 
 3
 (1) Failure to provide bilingual instruction which takes into account the special educational needs of Mexican-American and Yaqui Indian students;
 
 
 4
 (2) Failure to hire enough teachers of Mexican-American or Yaqui Indian descent who can adequately teach bilingual courses and effectively relate to the educational and cultural needs of the appellants;
 
 
 5
 (3) Failure to structure a curriculum that even minimally takes into account appellants' particular educational needs;
 
 
 6
 (4) Failure to structure a curriculum that even minimally reflects the historical contributions of people of appellants' descent to the State of Arizona and the United States.
 
 
 7
 The district court initially dismissed appellants' complaint on May 21, 1973 on the basis of this court's holding in Lau v. Nichols, 483 F.2d 791 (9th Cir. 1973), Rev'd, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974). This court, by an order dated April 5, 1975, remanded this action "for further consideration in accordance with the decision of the Supreme Court" in its Lau v. Nichols, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974). This court had held when Lau v. Nichols was before us that the Fourteenth Amendment Equal Protection Clause did not require the San Francisco Unified School District to provide compensatory English language instruction to students who spoke only Chinese. The Supreme Court, without reaching the constitutional question, held that 42 U.S.C. § 2000d and underlying HEW regulations require school districts to "take affirmative steps to rectify the language deficienc(ies)" of non-English-speaking students, and that the San Francisco Unified School District had not met this standard. 414 U.S. at 568, 94 S.Ct. at 789.
 
 
 8
 Upon remand, defendant-appellees made a motion for a more definite statement to clarify the distinction between the relief sought in this case and that ordered by the Supreme Court in Lau v. Nichols. In answer to interrogatories of the appellees and in argument before the district court appellants admitted that they did not complain of the school district's efforts to cure existing language deficiencies of non-English-speaking students. Instead, they contended below as well as here that the appellees have failed to provide them with a program of instruction that "has as its goal having a child graduate at each grade level from kindergarten to fourth year in high school competent and functional in reading, writing, and comprehension both in the child's own language, Spanish, and the language of the majority culture, English." The appellees allegedly also have failed to provide an educational program in which "all courses of instruction, testing procedures, instructional materials (are) bilingual and bicultural." Finally, appellants contend that the school district failed to reflect in its program of instruction the particular language, particular customs and particular history of the parents of each child attending the school.[1]
 
 
 9
 Although we have found no other case in which bilingual-bicultural education issues have been disposed of by summary judgment, we hold that in this case such disposition is proper. No material factual issue exists that requires resolution by trial. United States v. Allen, 578 F.2d 236 (9th Cir. 1978). Conclusory statements in pleadings do not constitute evidence of a dispute as to a material fact. Id.
 
 
 10
 Appellants argue that the duties they seek to impose upon the appellees are required by the Fourteenth Amendment's Equal Protection Clause, the Civil Rights Act of 1964, and the Equal Education Opportunity Act of 1974. We shall consider separately each of these sources of the duties appellants seek to impose upon appellees. In doing this our effort joins a growing number of cases in which the federal courts have been called upon to trace the bounds of "equal educational opportunity" as required by the Constitution or statute. Decisions flowing from such an undertaking involve, Inter alia, The question of "the proper role of the federal judiciary in overseeing the decisions of local administrative bodies in the field of public education." De La Cruz v. Tormey, 582 F.2d 45, 47 (9th Cir. 1978). Responding to this question also involves considering the interests of the children being educated, their parents, and the local school authorities, the respective roles of the state and federal governments, the competency of the federal courts to undertake the requested education oversight, and, at least in this case, the nature of the social compact that binds this Nation together.
 
 
 11
 We now turn to those sources from which the appellants assert flow the duties they insist the appellees must discharge.II.
 
 FOURTEENTH AMENDMENT.[2]
 
 12
 A. State Action.
 
 
 13
 Before applying equal protection analysis under the Fourteenth Amendment we must decide whether sufficient "state action" is present. The appellees argue that their failure to institute a bilingual-bicultural educational program constitutes inaction which cannot be "state action." Appellees' argument fails. In our Lau v. Nichols, supra, we did not hold that no "state action" existed, rather we held that the "action" taken by the San Francisco school district did not violate the students' constitutional rights. In this case, the school district has chosen affirmatively to provide a course of education other than bilingual and bicultural as defined by the appellants. By this exclusion it has chosen not to provide that which the appellants seek. This is "state action" sufficient to merit review by a federal court to determine whether it contravenes the Fourteenth Amendment. See Serna v. Portales Municipal Schools, 351 F.Supp. 1279, 1283 (D.N.M.1972), Aff'd on other grounds, 499 F.2d 1147 (10th Cir. 1974).
 
 
 14
 B. Standard of Review.
 
 
 15
 The Supreme Court in San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 35, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) taught us that education, although an important interest, is not guaranteed by the Constitution. Therefore, it is not a fundamental right. Differences in treatment of students in the educational process, which in themselves do not violate specific constitutional guarantees, do not violate the Fourteenth Amendment's Equal Protection Clause if such differences are rationally related to legitimate state interests.[3] This was the approach we adopted in our Lau v. Nichols; The Supreme Court did not reject the approach in its reversal of that case. Rodriguez suggests that a rational relationship to legitimate state interests is absent when the educational "system fails to provide each child with an opportunity to acquire the basic minimal skills necessary for the enjoyment of the rights of speech and of full participation in the political process." 411 U.S. at 37, 93 S.Ct. at 1299.
 
 
 16
 C. The Review.
 
 
 17
 We hold that the appellees fulfilled their equal protection duty to children of Mexican-American and Yaqui Indian origin when they adopted measures, to which the appellants do not object, to cure existing language deficiencies of non-English-speaking students. There exists no constitutional duty imposed by the Equal Protection Clause to provide bilingual-bicultural education such as the appellants request. The decision of the appellees to offer the educational program attacked by appellants bears a rational relationship to legitimate state interests. Nor, so far as this record reveals, does the appellees' program fail "to provide each child with an opportunity to acquire the basic minimal skills necessary for the enjoyment of the rights of speech and of full participation in the political process."
 
 
 18
 We reach this conclusion fully aware of the serious nature of the appellants' contentions. Our analysis returns us to the foundations of organized society as manifested by the nation-state. We commence by recognizing that the existence of the nation-state rests ultimately on the consent of its people. The scope of this fundamental compact may be extensive or limited. Its breadth fixes the effective limits of government by the nation-state.
 
 
 19
 Linguistic and cultural diversity within the nation-state, whatever may be its advantages from time to time, can restrict the scope of the fundamental compact. Diversity limits unity. Effective action by the nation-state rises to its peak of strength only when it is in response to aspirations unreservedly shared by each constituent culture and language group. As affection which a culture or group bears toward a particular aspiration abates, and as the scope of sharing diminishes, the strength of the nation-state's government wanes.
 
 
 20
 Syncretism retards, and sometimes even reverses, the shrinkage of the compact caused by linguistic and cultural diversity. But it would be incautious to strengthen diversity in language and culture repeatedly trusting only in syncretic processes to preserve the social compact. In the language of eighteenth century philosophy, the century in which our Constitution was written, the social compact depends on the force of benevolence which springs naturally from the hearts of all men but which attenuates as it crosses linguistic and cultural lines. See Wills, Inventing America, 315, Ch. 13, 15, 23 and Passim (1978). Multiple linguistic and cultural centers impede both the egress of each center's own and the ingress of all others. Benevolence, moreover, spends much of its force within each center and, to reinforce affection toward insiders, hostility toward outsiders develops.
 
 
 21
 The fundamental nature of these tendencies makes clear that their scope varies from generation to generation and is fixed by the political process in its highest sense. The Constitution, aside from guaranteeing to individuals certain basic rights, privileges, powers, and immunities, does not speak to such matters; it merely evidences a compact whose scope and strength cannot be mandated by the courts but must be determined by the people acting upon the urgings of their hearts. The decision of the appellees to provide a predominantly monocultural and monolingual educational system was a rational response to a quintessentially "legitimate" state interest. The same perforce would be said were the appellees to adopt the appellants' demands and be challenged by an English-speaking child and his parents whose ancestors were Pilgrims.
 
 
 22
 Whatever may be the consequences, good or bad, of many tongues and cultures coexisting within a single nation-state, whether the children of this Nation are taught in one tongue and about primarily one culture or in many tongues and about many cultures cannot be determined by reference to the Constitution. We hold, therefore, that the Constitution neither requires nor prohibits the bilingual and bicultural education sought by the appellants. Such matters are for the people to decide.
 
 
 23
 D. The Cases.
 
 
 24
 The cases which have dealt with constitutional claims to bilingual and bicultural education are not inconsistent with our holding. Directly supportive is Keyes v. School District No. 1, 521 F.2d 465 (10th Cir. 1975), Cert. denied, 423 U.S. 1066, 96 S.Ct. 806, 46 L.Ed.2d 657 (1976), which refused to order bilingual-bicultural education as a remedy to eliminate the consequences of de jure segregation and expressly held that the "Cardenas Plan," a specific program of bilingual-bicultural education, was not required by the Fourteenth Amendment. On the other hand, in United States v. Texas Education Agency, 532 F.2d 380, 398 (5th Cir.), Vacated sub nom. Austin Independent School District v. United States, 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603 (1976), a certain form of bilingual-bicultural education was held to be a proper part of a remedy fashioned by the district court to eliminate de jure segregation. A similar holding where de jure segregation had existed was made in United States v. Texas, 342 F.Supp. 24 (E.D.Tex.1971), Aff'd, 466 F.2d 518 (5th Cir. 1972). Fashioning a remedy for de jure segregation, however, is a task quite distinct from determining whether there exists a constitutional right to bilingual-bicultural education in a desegregated system. The first involves, as Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) directs us, a balancing of individual and collective interests having as its goal the correction of de jure segregation. Determining that a remedy is appropriate to further the correction of de jure segregation does not A fortiori make it a constitutional entitlement in the absence of de jure segregation. That must be determined by the analysis employed above. Supporting Keyes and our holding are two district court cases, Otero v. Mesa County Valley School District No. 51, 408 F.Supp. 162 (D.Colo.1975), Vacated on other grounds, 568 F.2d 1312 (10th Cir. 1978) and Morales v. Shannon, 366 F.Supp. 813, 821-23 (W.D.Tex.1973), Rev'd on other grounds, 516 F.2d 411 (5th Cir.), Cert. denied, 423 U.S. 1034, 96 S.Ct. 566, 46 L.Ed.2d 408 (1975). A contrary position was taken in Serna v. Portales Municipal Schools, 351 F.Supp. 1279 (D.N.M.1972), Aff'd on other grounds, 499 F.2d 1147 (10th Cir. 1974).[4]
 
 
 25
 Finally, our recent decision in De La Cruz v. Tormey, 582 F.2d 45 (9th Cir. 1978) provides no comfort to the appellants. There we held that a complaint that alleged "a course of conduct by defendants susceptible of an inference of intentional discrimination" (582 F.2d at 58) on the basis of sex contrary to the Equal Protection Clause survived a motion to dismiss.[5] Appellants here alleged no course of conduct from which an inference of intentional discrimination can be drawn. They acknowledge that the remedial instruction in English is sufficient to allow Mexican-American and Yaqui students to participate effectively in the educational program. A failure to do more constitutes no intentionally discriminatory course of conduct condemned by the Equal Protection Clause. Assuming adequate remedial instruction, education in English reflecting American culture and values only is not a discriminatory course of conduct.
 
 III.
 
 26
 CIVIL RIGHTS ACT OF 1964.
 
 
 27
 The appellants fare no better under the Civil Rights Act of 1964, 42 U.S.C. § 2000d. Section 601 states:
 
 
 28
 No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.
 
 
 29
 Under authority of Section 602 of the Act, HEW authorized regulation 45 C.F.R. § 80(b)(1), which provides that recipients may not:
 
 
 30
 (ii) Provide any service, financial aid, or other benefit to an individual which is different, or is provided in a different manner, from that provided to others under the program;
 
 
 31
 (iv) Restrict an individual in any way in the enjoyment of any advantage or privilege enjoyed by others receiving any service, financial aid, or other benefit under the program . . . .
 
 
 32
 In addition, HEW clarifying guidelines state:
 
 
 33
 Where inability to speak and understand the English language excludes national origin-minority group children from effective participation in the educational program offered by a school district, the district must take affirmative steps to rectify the language deficiency in order to open its instructional program to these students.
 
 
 34
 35 Fed.Reg. 11,595 (1970).
 
 
 35
 In Lau v. Nichols, supra, the Supreme Court, interpreting these regulations, emphasized that the failure of the San Francisco Unified School District to teach remedial English Excluded Chinese-speaking students from any meaningful education.[6] The Court stated: "(T)here is no equality of treatment merely by providing students with the same facilities, textbooks, teachers, and curriculum; for students who do not understand English are Effectively foreclosed from any meaningful education." 414 U.S. at 566, 94 S.Ct. at 788 (emphasis added). Under the Court's analysis of the Title VI requirements, non-English-speaking students received fewer benefits from the school system than did their English-speaking counterparts. 414 U.S. at 568, 94 S.Ct. at 789.
 
 
 36
 Appellants argue that the failure to implement a bilingual-bicultural education program staffed with bilingual instructors forecloses them from meaningful education and that they receive fewer benefits from the district's educational programs than do English-speaking children. We do not agree. Providing the appellants with remedial instruction in English which appellants appear to admit complies with Lau's mandate makes available the meaningful education and the equality of educational opportunity that Section 601 requires.[7] There is no suggestion that appellees' remedial program operates "as an educational deadend or permanent track." 414 U.S. at 568, 94 S.Ct. at 789.
 
 IV.
 
 37
 EQUAL EDUCATIONAL OPPORTUNITY ACT OF 1974.
 
 
 38
 Congress enacted the Equal Educational Opportunity Act as a part of the Education Amendments of 1974. The portion of the Act applicable to the present case is Section 204, 20 U.S.C. § 1703, which states:
 
 
 39
 No state shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by
 
 
 40
 (f) the failure by an educational agency to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs.
 
 
 41
 Because Section 1703(f) was proposed as an amendment from the floor of the House, there is very little legislative history. No previous decision has interpreted the scope of the "appropriate action" requirement. Inasmuch as, to repeat, the appellants do not challenge the appellees' efforts to cure existing language deficiencies we are not asked to decide whether their chosen program constitutes "appropriate action to overcome language barriers that impede equal participation by its students in its instructional program." Rather the issue is whether "appropriate action" Must include the bilingual-bicultural education the appellants seek. We hold that it need not. To hold as appellants urge us to do would distort the relevant statutory language severely. The interpretation of floor amendments unaccompanied by illuminating debate should adhere closely to the ordinary meaning of the amendment's language. Deerfield Hutterian Association v. Ipswich Board of Education, 444 F.Supp. 159 (D.S.D.1978) is not to the contrary. It merely holds that a complaint alleging that a board of education "made no plans or provisions to deal with the language handicap" states a claim under Section 1703(f). We agree. In this case plans were made and implemented and the effectiveness of these plans is not challenged. Deerfield did not address the issue which this case presents.
 
 
 42
 AFFIRMED.
 
 
 
 *
 Hon. Spencer M. Williams, United States District Judge for the Northern District of California, sitting by designation
 
 
 [1]
 The U.S. Office of Education has defined bilingual education as:
 instruction in two languages and the use of those two languages as mediums of instruction for any part of or all of the school curriculum. Study of the history and culture associated with a student's mother tongue is considered an integral part of bilingual education.
 U.S. Office of Education, Draft Guidelines to the Bilingual Education Program, in T. Andersson & M. Boyer, Bilingual Schooling in the United States, Appendix B (1970).
 Bilingual programs are not identical; they may take many forms and have many goals. They all, however, are intended to reduce the disadvantages of ethnic and racial minorities. See W. Foster, Bilingual Education; An Educational and Legal Survey, 5 J. Law Educ. 149 (April 1976); K. Gezi, Bilingual-Bicultural Education: A Review of Relevant Research, Calif. J. Educ. Res., Vol. XXV, No. 5, 223.
 Beginning with the passage of the Bilingual Education Act in 1968, 20 U.S.C. § 880b, legislators have recognized the desirability of encouraging bilingual education programs. Section 701 of Pub.L. 90-247, Title VII, provided as follows:
 The Congress hereby finds that one of the most acute educational problems in the United States is that which involves millions of children of limited English-speaking ability because they come from environments where the dominant language is other than English; that additional efforts should be made to supplement present attempts to find adequate and constructive solutions to this unique and perplexing educational situation; and that the urgent need is for comprehensive and cooperative action now on the local, State, and Federal levels to develop forwardlooking approaches to meet the serious learning difficulties faced by this substantial segment of the Nation's schoolage population.
 Besides federal encouragement, as of 1977, 24 states expressly or implicitly permitted instruction in a language other than English. Since 1971, eight of the 24 states have stipulated certain conditions under which a school is required to offer such courses. C. Ovando, School Implications of the Peaceful Latino Invasion, Phi Delta Kappan, Dec. 1977, at 232.
 
 
 [2]
 In Lau v. Nichols, 483 F.2d 791 (9th Cir. 1973), this court held that the Equal Protection Clause of the Fourteenth Amendment did not require the San Francisco Unified School District to provide all non-English-speaking Chinese students attending district schools with bilingual compensatory education. The Supreme Court reversed this decision without reaching the constitutional question. Lau v. Nichols, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974). It held solely that regulations issued under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, "required remedial instruction where inability to understand English excluded children of foreign ancestry from participation in educational programs. (414 U.S.) at 568, 94 S.Ct. 786." Regents of the University of California v. Bakke, --- U.S. ----, ----, 98 S.Ct. 2733, 2755, 57 L.Ed.2d 750 (1978)
 Because the Supreme Court purported not to discuss the Fourteenth Amendment requirements, this court's constitutional holding in Lau v. Nichols remains an applicable precedent. In Regents of the University of California v. Bakke, however, the Court stated: "In view of the clear legislative intent, Title VI must be held to proscribe only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment." --- U.S. at ----, 98 S.Ct. at 2747 (Powell, J.). Justices Brennan, White, Marshall, and Blackmun, concurring in the conclusion that Title VI's standard is no broader than the Constitution's, noted the inconsistency of this position with the Court's opinion in Lau v. Nichols, --- U.S. at ----, 98 S.Ct. at 2780. Because of the uncertainty surrounding the continuing validity of our Fourteenth Amendment treatment in Lau v. Nichols, we discuss the appellants' constitutional argument.
 
 
 [3]
 Appellants make no argument that appellees have made a "suspect classification" that would necessitate a more stringent analysis. Inasmuch as appellees only differentiate explicitly among students with respect to the provisions of remedial English instruction, no such claim is possible
 
 
 [4]
 In Serna, the district court found an unconstitutional denial of equal educational opportunity and ordered more and better bilingual-bicultural education and the hiring of a greater number of Spanish-speaking teachers. The Tenth Circuit affirmed the decision on the non-constitutional ground of Section 601 of Title VI. The Court of Appeals supported its affirmance of the broad remedy with Fourteenth Amendment cases such as Swann v. Charlotte-Mecklenburg Board of Education, supra, and Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). 499 F.2d at 1154. The court further stated that because § 601 gives a right to bilingual instruction, bilingual-bicultural education can be ordered. Id. Because we find no violation of § 601 we need not decide whether the sweeping judicial remedies appropriate under the Fourteenth Amendment are available for statutory violations. The Tenth Circuit, moreover, has questioned seriously the remedy found appropriate in Serna. Keyes v. School District No. 1, 521 F.2d 465, 483 n. 22 (10th Cir. 1975), Cert. denied, 423 U.S. 1066, 96 S.Ct. 806, 46 L.Ed.2d 657 (1976)
 
 
 [5]
 In De La Cruz, the denial of child care facilities foreclosed certain plaintiffs from participation in the existing curriculum of a junior college. This court distinguished previous Supreme Court cases such as Nashville Gas Co. v. Satty, 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977), and General Electric Co. v. Gilbert, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), that had held the denial of a benefit not to violate Fourteenth Amendment rights:
 Where, however, a refusal to confer additional benefits is alleged, on account of the peculiar nature of those benefits, to impair the value of Existing programs to members of a particular group, the principles sought to be derived from Gilbert et al. do not support the conclusion that this allegation may be deemed meritless prior to any consideration of its evidentiary basis.
 582 F.2d at 57.
 In the present case, appellees presently are providing remedial language instruction intended to assure that appellants derive equivalent value from existing programs. Thus this case resembles the "much easier" case referred to in De La Cruz, id., in which appellants merely challenge the refusal to initiate or support a program of particular value to appellants.
 
 
 [6]
 As this court noted in De La Cruz v. Tormey, 582 F.2d at 52, a majority of the Justices of the Supreme Court in Lau v. Nichols held that discrimination which had the effect of depriving students of equal educational opportunity was barred by § 601 "even though no purposeful design is present." 414 U.S. at 568, 94 S.Ct. at 789
 
 
 [7]
 Our holding is consistent with the two previous circuit court opinions that have touched upon § 601 violations. In Serna, the Fifth Circuit, applying Lau v. Nichols, found a violation of § 601, stating:
 Appellees are Spanish surnamed students who prior to this lawsuit were placed in totally English speaking schools. There is substantial evidence that most of these Spanish surnamed students are deficient in the English language; nevertheless No affirmative steps were taken by the Portales school district to rectify these language deficiencies.
 499 F.2d at 1153 (emphasis added).
 In Keyes v. School District No. 1, supra, the Tenth Circuit found no support for a § 601 violation where the defendant school district had determined which students needed special help in "acquiring language skills necessary to function satisfactorily in school" and directed programs to these students. 521 F.2d at 483 n. 22.